[L.A. No. 30588. Nov. 10, 1976.]

SWEETWATER VALLEY CIVIC ASSOCIATION et al.,
Plaintiffs and Appellants, v.
CITY OF NATIONAL CITY et al., Defendants and Respondents.

**COUNSEL**

Higgs, Fletcher & Mack, Donald H. Glaser and Roger Hedgecock for Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, Robert H. O'Brien, Assistant Attorney General, Nicholas C. Yost and C. Foster Knight, Deputy Attorneys General, Donald L. Clark, Acting County Counsel (San Diego), John McEvoy, Deputy County Counsel, Marguerite B. Stein and Thomas L. Marshall as Amici Curiae on behalf of Plaintiffs and Appellants.

Jennings, Engstrand & Henrikson, Donald F. McLean, Jr., and C. Michael Cowett for Defendants and Respondents.

**OPINION**

**CLARK, J.**—The National City Redevelopment Agency and City Council of National City declared 130 acres of land a "blighted area" under the Community Redevelopment Law (CRL) (Health & Saf. Code, § 33000 et seq.)[1] and approved a redevelopment plan for a 70-building

---

[1] Unless otherwise specified, all statutory references are to the Health and Safety Code.

shopping center to be constructed on the site. Petitioning for writ of mandate to set aside the approval, the Sweetwater Valley Civic Association, a group of 600 taxpayers, residents, and property owners of Sweetwater Valley, allege that the property is not an appropriate area for redevelopment. Following trial, the petition was denied, and the association appealed from the ensuing judgment.[2]

The Bonita Golf Course, consisting of 18 holes, a separate driving range, and a putting green, comprises 103 acres of the asserted "blight area." The golf course is part of a private club, but available for public use. The balance of the 130 acres remains unproductive. A single party owns 115 of the 130 acres. Seventeen acres lie in Chula Vista or in unincorporated territory and are zoned for open space and proposed for inclusion in Sweetwater Regional Park.

A small portion of the golf course was recently taken for freeway right-of-way. Due to development of a nearby area, there has been a change in the course of water run-off, the driving range becoming subject to flooding. Except for a day or two, the golf course has continued in constant use but the driving range has been closed for repairs for as long as three weeks due to flooding. With minor exceptions the entire property is subject to flooding by the "100-year storm."

The average assessed valuation per acre of the golf course property is approximately two-thirds of the National City average and one-tenth of National City's other redevelopment project. The proposed development would substantially increase the value of the golf course land.

The golf course is smaller than the usual 18-hole course. Irrigation is by well water, and during dry periods, salt water intrudes causing a decline in plant growth and harm to some eucalyptus trees. The ground water conditions have also required increased application of fertilizer. However, there is no evidence that the water and soil problems have caused a decline in course utilization.

During the 18 years the golf course has been in operation it has increased in popularity, and many tournaments sponsored by the city

---

[2]While the appeal was pending, there was an attempt to repeal the city's ordinance designating the project area as "blighted." However, 62.4 percent of the voters voted against repeal.

have been held thereon. The course is used by over 600 club members, by schools and by the general public. There is no evidence that recent changes have reduced either membership or revenue; rather, use has increased. Should redevelopment occur, the owners plan to build another golf course nearby.

The property is encumbered by 55 utility and street and 4 private easements, making private redevelopment "extremely difficult." To develop the property for private commercial use, most of these would have to be acquired, some utilities relocated, a flood channel created and the site elevated by earth fill, at "tremendous costs."

THE STATUTES

Section 33030 recognizes the existence of "blighted" areas in many communities, describing them as constituting "either social or economic liabilities, or both, requiring redevelopment in the interest of the health, safety, and general welfare." The section also provides: "These blighted areas are characterized by one or more of the conditions set forth in Sections 33031 to 33034, inclusive."[3]

Sections 33035-33037 establish that the redevelopment of a blighted area is in the public interest.[4]

---

[3]Section 33030 provides: "It is found and declared that there exist in many communities blighted areas which constitute either social or economic liabilities, or both, requiring redevelopment in the interest of the health, safety, and general welfare of the people of such communities and of the State. These blighted areas are characterized by one or more of the conditions set forth in Sections 33031 to 33034, inclusive."

Section 33032 provides: "A blighted area is characterized by: (a) An economic dislocation, deterioration, or disuse resulting from faulty planning. . . . (e) The existence of lots or other areas which are subject to being submerged by water."

Section 33033 provides: "A blighted area is characterized by a prevalence of depreciated values, impaired investments, and social and economic maladjustment to such an extent that the capacity to pay taxes is reduced and tax receipts are inadequate for the cost of public services rendered."

Section 33034 provides: "A blighted area is characterized by: (a) In some parts of the blighted area, a growing or total lack of proper utilization of areas, resulting in a stagnant and unproductive condition of land potentially useful and valuable for contributing to the public health, safety, and welfare. [¶] (b) In other parts of the blighted area, a loss of population and reduction of proper utilization of the area, resulting in its further deterioration and added costs to the taxpayer for the creation of new public facilities and services elsewhere."

Section 33031 relates to slums, and section 33032.1 related to seashore properties.

[4]Section 33035 provides: "It is further found and declared that: [¶] (a) The existence of blighted areas characterized by any or all of such conditions constitutes a serious and growing menace which is condemned as injurious and inimical to the public health,

Sections 33070 and 33071 establish additional purposes of redevelopment: the establishment of decent housing, expansion of the supply of low and moderate income housing, creation of employment opportunities, and psychological growth and well-being of all citizens.[5]

safety, and welfare of the people of the communities in which they exist and of the people of the State. [¶] (b) Such blighted areas present difficulties and handicaps which are beyond remedy and control solely by regulatory processes in the exercise of police power. [¶] (c) They contribute substantially and increasingly to the problems of, and necessitate excessive and disproportionate expenditures for, crime prevention, correction, prosecution, and punishment, the treatment of juvenile delinquency, the preservation of the public health and safety, and the maintaining of adequate police, fire, and accident protection and other public services and facilities. [¶] (d) This menace is becoming increasingly direct and substantial in its significance and effect. [¶] (e) The benefits which will result from the remedying of such conditions and the redevelopment of blighted areas will accrue to all the inhabitants and property owners of the communities in which they exist."

Section 33036 provides: "It is further found and declared that: [¶] (a) Such conditions of blight tend to further obsolescence, deterioration, and disuse because of the lack of incentive to the individual landowner and his inability to improve, modernize, or rehabilitate his property while the condition of the neighboring properties remains unchanged. [¶] (b) As a consequence the process of deterioration of a blighted area frequently cannot be halted or corrected except by redeveloping the entire area, or substantial portions of it. [¶] (c) Such conditions of blight are chiefly found in areas subdivided into small parcels, held in divided and widely scattered ownerships, frequently under defective titles, and in many such instances the private assembly of the land in blighted areas for redevelopment is so difficult and costly that it is uneconomic and as a practical matter impossible for owners to undertake because of lack of the legal power and excessive costs. [¶] (d) The remedying of such conditions may require the public acquisition at fair prices of adequate areas, the clearance of the areas through demolition of existing obsolete, inadequate, unsafe, and insanitary buildings, and the redevelopment of the areas suffering from such conditions under proper supervision, with appropriate planning, and continuing land use and construction policies."

Section 33037 provides: "For these reasons it is declared to be the policy of the State: [¶] (a) To protect and promote the sound development and redevelopment of blighted areas and the general welfare of the inhabitants of the communities in which they exist by remedying such injurious conditions through the employment of all appropriate means. [¶] (b) That whenever the redevelopment of blighted areas cannot be accomplished by private enterprise alone, without public participation and assistance in the acquisition of land, in planning and in the financing of land assembly, in the work of clearance, and in the making of improvements necessary therefor, it is in the public interest to employ the power of eminent domain, to advance or expend public funds for these purposes, and to provide a means by which blighted areas may be redeveloped or rehabilitated. [¶] (c) That the redevelopment of blighted areas and the provisions for appropriate continuing land use and construction policies in them constitute public uses and purposes for which public money may be advanced or expended and private property acquired, and are governmental functions of state concern in the interest of health, safety, and welfare of the people of the State and of the communities in which the areas exist. [¶] (d) That the necessity in the public interest for the provisions of this part is declared to be a matter of legislative determination."

[5]Section 33070 provides: "The Legislature finds and declares that decent housing and genuine employment opportunities for all the people of this state are vital to the state's future peace and prosperity, for all of the following reasons: [¶] (a) Hazardous,

JUDICIAL REVIEW

█ At the outset, defendants contend that determination of blight is not subject to judicial review. They rely upon section 33368 providing, "The decision of the legislative body shall be final and conclusive, and it shall thereafter be conclusively presumed that the project area is a blighted area as defined by Section 33031 through 33034 and that all prior proceedings have been duly and regularly taken." Defendants analogize to cases involving the finding of public necessity in condemnation cases where it has been held that the finding does not present a justiciable issue "even though fraud, bad faith, or abuse of discretion may be alleged in connection with the condemning body's determination of such necessity." (E.g., *People* v. *Chevalier* (1959) 52 Cal.2d 299, 307 [340 P.2d 598].)

However, other sections and the legislative history of section 33368 indicate that the conclusive presumption becomes applicable only if judicial review is not sought within 60 days of the adoption of the redevelopment plan. Section 33500 provides that no "action attacking or otherwise questioning the validity of . . . any of the findings or determinations of the agency or legislative body . . . shall be brought . . . after the elapse of 60 days from and after the date of adoption of the ordinance adopting the plan." The negative implication of the statute of limitation provision is that judicial review of the findings is available when sought within the 60-day period.

More importantly section 33501 provides for judicial review: "An action may be brought pursuant to Chapter 9 (commencing with Section 860) of Title 10 of Part 2 of the Code of Civil Procedure to determine the validity . . . of a redevelopment plan . . . including without limiting the generality of the foregoing . . . the designation of the survey area, the selection of the project area. . . ." Code of Civil Procedure section 860 provides for a validation proceeding in the nature of a proceeding in

congested, and insanitary housing debilitates occupants' health to the point of impairing motivation and achievement. [¶] (b) Lack of employment opportunity creates despair and frustration which may precipitate violence. [¶] (c) Unfit housing and lack of employment opportunity depend on each other to perpetuate a system of dependency and hopelessness which drains the state of its valuable financial and human resources."

Section 33071 provides: "The Legislature further finds and declares that a fundamental purpose of redevelopment is to expand the supply of low- and moderate-income housing, to expand employment opportunities for jobless, underemployed, and low-income persons, and to provide an environment for the social, economic, and psychological growth and well-being of all citizens."

rem. Although the section provides for the agency to bring the action, section 863 of that code permits any "interested person" to bring the action within 60 days if the agency does not.

Prior to 1959 former section 33746, the then statute of limitation section, also provided the findings of an agency and legislative body adopting any redevelopment plan "may be judicially reviewed by a court of competent jurisdiction." The conclusive presumption provision now found in section 33368 was enacted in that year (Stats. 1959, ch. 1102, § 18, p. 3181), but the quoted provision for judicial review was not changed. The quoted provision was deleted in 1961, but the Legislature also added the general validating provision in Code of Civil Procedure section 860 et seq. permitting judicial review (Stats. 1961, ch. 1479, § 1, p. 3331) and made the general provision applicable to redevelopment plans (Stats. 1961, ch. 1557, § 2, p. 3380).

Thus it appears the Legislature did not intend to eliminate all judicial review of findings in 1959 when it added the conclusive presumption because it left standing the express provision for judicial review. The provision was not eliminated until 1961 when the Legislature added the general review provisions of the Code of Civil Procedure and expressly made them applicable to redevelopment plans.

We conclude both that judicial review of the agency's and legislative body's findings authorized by section 33501 is available provided it is sought within the 60-day period of section 33500, and that the conclusive presumption of section 33368 applies only to actions filed after the period has expired. (See *In re Redevelopment Plan for Bunker Hill* (1964) 61 Cal.2d 21, 37-40 [37 Cal.Rptr. 74, 389 P.2d 583].)

BLIGHT

To allow redevelopment under CRL, the proposed area must be blighted. A finding of blight requires (1) that the area suffer "either social or economic liabilities, or both, requiring redevelopment in the interest of the health, safety, and general welfare" and (2) the existence of one of the characteristics of blight. (§ 33030 (fn. 3).)

In addition, section 33030 and the sections set forth above clearly establish that it is not sufficient to merely show that the area is not being put to its optimum use, or that the land is more valuable for other uses.

While rejecting constitutional attacks on CRL, the court in *Redevelopment Agency* v. *Hayes* (1954) 122 Cal.App.2d 777, 793 [266 P.2d 105], recognized " '[o]ne man's land cannot be seized by the Government and sold to another man merely in order that the purchaser may build upon it a better house or a house which better meets the Government's idea of what is appropriate or well designed.' " The court stressed: "Public agencies and courts both should be chary of the use of the act unless, as here, there is a situation where the blight is such that it constitutes a real hindrance to the development of the city and cannot be eliminated or improved without public assistance. It never can be used just because the public agency considers that it can make a better use or planning of an area than its present use or plan." (122 Cal.App.2d at p. 812.)

By requiring a showing of "liabilities" plus a specified characteristic of blight, the Legislature made clear its intent that a determination of blight be made—not on the basis of potential alternative use of the proposed area—but on the basis of the area's existing use.[6]

In determining whether an area is blighted within CRL, we are mindful of related constitutional and statutory provisions dealing with land use. Article XIII, section 8, of our Constitution recognizes the need to promote conservation of "open space" land—including that used for recreation—and authorizes the Legislature to limit its valuation for tax purposes. (See *Associated Home Builders etc. Inc.* v. *City of Walnut Creek* (1971) 4 Cal.3d 633, 638-639 [94 Cal.Rptr. 630, 484 P.2d 606, 43 A.L.R.3d 847].) In Government Code sections 65560-65570, the Legislature provides for local open space plans by stating that preservation of "open-space land . . . is necessary . . . for recreation" among other needs and that "discouraging premature and unnecessary conversion of open-space land to urban uses is a matter of public interest." (Gov. Code, § 65561.) Similarly, Government Code sections 51070-51097, providing for open space easements and the Williamson Act (Gov. Code, §§ 51200-51295), providing for reduced tax assessment benefits, reflect the legislative judgment that the maintenance of open space land for recreational purposes is in the public interest.

---

[6]Proposed use of the subject property is not entirely irrelevant to CRL proceedings. Proposed use must be considered under some provisions of the act, for example, expanding the supply of low- and moderate-income housing and employment opportunity for unemployed and low income people. Inability of private enterprise to redevelop the area is an additional consideration of CRL. (§§ 33071; 33037.) These considerations are not at issue in this case.

The real property subject to this action has not become an economic liability within the purview of section 33030; nor is there evidence of "social" blight. Drainage and soil problems—and even condemnation of part of the golf course—while no doubt burdening the property, have not ended its present economic use. To the contrary, the evidence reveals the golf course is at least marginally profitable. While the costs of removing the easements and solving the drainage problems make private redevelopment infeasible, that issue arises only after first finding the subject property is blighted. In the circumstances, the golf course being economically profitable—in combination with its open space nature—the property constitutes neither an economic nor a social liability. Therefore, it is not blighted.

The judgment is reversed with direction to enter judgment for petitioner.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Sullivan, J., and Richardson, J., concurred.

Respondents' petition for a rehearing was denied December 9, 1976.