[No. G033549. Fourth Dist., Div. Three. Feb. 24, 2005.]

HARVEY BOELTS, Plaintiff and Respondent, v.
CITY OF LAKE FOREST et al., Defendants and Appellants.

**COUNSEL**

Law Offices of Kathryn Reimann, Kathryn Reimann; Best Best & Kreiger, Scott C. Smith and Gene Tanaka for Defendants and Appellants.

Richards, Watson & Gershon and T. Peter Pierce for League of California Cities and Other Agencies as Amicus Curiae on behalf of Defendants and Appellants.

Palmieri, Tyler, Wiener, Wilhelm & Waldron, Michael H. Leifer and Ronald M. Cole for Plaintiff and Respondent.

OPINION

SILLS, P. J.—

## I. SUMMARY

■ California's Community Redevelopment Law (Health & Saf. Code, § 33000 et seq.[1]) requires a finding that a project area is blighted in order to establish a redevelopment plan. (§ 33367, subd. (d)(1); e.g., *Sweetwater Valley Civic Assn. v. City of National City* (1976) 18 Cal.3d 270, 277 [133 Cal.Rptr. 859, 555 P.2d 1099] ["To allow redevelopment under the CRL, the proposed area must be blighted."]; *Beach-Courchesne v. City of Diamond Bar* (2000) 80 Cal.App.4th 388, 389 [95 Cal.Rptr.2d 265] ["A determination of blight is a prerequisite to invoking redevelopment."].)

■ This required finding of blight is subject to judicial review in a validation action (Code Civ. Proc., § 860 et seq.), and if there is insufficient evidence that the area is indeed blighted, the court must issue a judgment invalidating the redevelopment plan. (E.g., *Sweetwater Valley Civic Assn. v. City of National City, supra,* 18 Cal.3d 270 [directing judgment be entered for writ of mandate setting aside redevelopment plan for golf course]; *Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency* (2000) 82 Cal.App.4th 511 [98 Cal.Rptr.2d 334] [lack of evidence of blight for area, including many acres of forest and a golf course, required judgment invalidating plan]; *Beach-Courchesne v. City of Diamond Bar, supra,* 80 Cal.App.4th 388 [lack of substantial evidence that affluent suburban area was blighted required judgment invalidating redevelopment plan].)

Of course, judicial review of a blight finding is what one would expect given that the purpose of redevelopment is the *remedying of blight,* and redevelopment invokes "extraordinary powers." As Justice Joan Dempsey Klein wrote for the court in *Beach-Courchesne v. City of Diamond Bar, supra,* 80 Cal.App.4th at page 407, "The purpose of the CRL is to provide a means of remedying blight where it exists. The CRL is not simply a vehicle for cash-strapped municipalities to finance community improvements."

■ However, a validation challenge to an *initial* finding of blight is subject to some stringent deadlines. Section 33500 states that any action attacking the validity of a redevelopment plan cannot be made after the elapse of 60 days from the adoption of the ordinance adopting the plan.[2] A

---

[1] All statutory references in this opinion will be to the Health and Safety Code unless otherwise designated.

[2] Section 33500 provides in its entirety: "No action attacking or otherwise questioning the validity of any redevelopment plan, or amendment to a redevelopment plan, or the adoption or

similar 60-day deadline is found in the procedural statutes authorizing validation actions.[3]

Sixty days is, of course, a short statute of limitations by common legal standards.[4] But there is a reason for it: to protect decisions in *reliance* on the plan. As the court noted in *Plunkett v. City of Lakewood* (1975) 44 Cal.App.3d 344, 347 [116 Cal.Rptr. 885]—in a decision upholding a judgment throwing out a challenge to a redevelopment plan because the challenge came about two months too late—the purpose of the truncated statute of limitations is to "promote prompt adjudication of such challenges *before substantial public funds have been expended* and *before relocation of business and people* have rendered remedial action ineffective." (Italics added.)

■ Redevelopment plans are also, however, subject to *amendment.* Article 12 of the Community Redevelopment Law (§§ 33450–33458) is devoted to the procedures governing such amendments. One of the statutes therein, section 33457.1, provides that when an amendment *warrants* it, the relevant local legislative body adopting the amendment *must* make the findings required to support an initial redevelopment plan, one of which is a finding of blight.[5]

---

approval of such plan, or amendment, or any of the findings or determinations of the agency or legislative body in connection with such plan shall be brought prior to the adoption of the redevelopment plan nor at any time after the elapse of 60 days from and after the date of adoption of the ordinance adopting or amending the plan. [¶] The amendments made to this section at the 1977–78 Regular Session of the Legislature do not represent a change in, but are declaratory of, existing law."

[3] The structure of these statutes is, however, a little convoluted because they begin with the idea, in section 860 of the Code of Civil Procedure, that a *public agency* has the right to bring such a challenge within 60 days, but then, a few sections later, in section 863, allow private parties the same right.

First, here is the current text of section 860 of the Code of Civil Procedure: "A public agency may upon the existence of any matter which under any other law is authorized to be determined pursuant to this chapter, and for 60 days thereafter, bring an action in the superior court of the county in which the principal office of the public agency is located to determine the validity of such matter. The action shall be in the nature of a proceeding in rem."

Next we quote the pertinent parts of section 863 of the Code of Civil Procedure: "If no proceedings have been brought by the public agency pursuant to this chapter, any interested person may bring an action within the time and in the court specified by Section 860 to determine the validity of such matter."

[4] Sometimes the truncation of statutes of limitations can itself be significant, as, for example, in bearing on whether contractual arbitration provisions are enforceable. (E.g., *Martinez v. Master Protection Corp.* (2004) 118 Cal.App.4th 107, 118 [12 Cal.Rptr.3d 663] [contractually shortened statute of limitations made agreement to arbitrate employee civil rights claims unconscionable].)

[5] Here is the full text of section 33457.1: "To the extent warranted by a proposed amendment to a redevelopment plan, (1) the ordinance adopting an amendment to a redevelopment plan shall contain the findings required by Section 33367 and (2) the reports and

■ And that brings us to the instant appeal, where we will uphold the trial judge's determination that, under the particular facts before him concerning an amendment to a redevelopment plan proposed 14 years after the initial plan was adopted, the requirement of a blight finding to support the amendment was indeed "warranted." We will further uphold his decision invalidating the amendment because of insufficient evidence of blight.

In doing so, however, we stress that our decision today is grounded in the particular facts before the trial judge, which, in sum, were these: The area was originally part of the unincorporated area of a county, and it was the county that adopted an original redevelopment plan focusing on traffic improvements. Basically the area in question was often in a state of gridlock and the county simply wanted to obtain money to widen area roads. As such, the original redevelopment plan did not include the power of eminent domain. Then, 14 years later and after the area had been incorporated into the city of Lake Forest, the city adopted an amendment to the 14-year-old redevelopment plan adding the power of eminent domain, and the focus of the city's amendment was no longer traffic improvement, but the upscale remodeling of two local shopping centers which were underproducing sales tax revenue.

■ In the process of upholding the trial judge's decision, we reject the city's argument that section 33368 precludes, a priori, judicial review of *any* blight findings made after a redevelopment plan is *originally* adopted, even if an *amendment* warrants such findings. While section 33368 gives preclusive effect to an *original* blight finding made in connection with the initial adoption of a redevelopment plan,[6] the statute has within it language which contemplates judicial review of blight findings in timely filed validation proceedings attacking subsequent *amendments* to redevelopment plans pursuant to section 33457.1 when those subsequent amendments warrant blight findings.

---

information required by Section 33352 shall be prepared and made available to the public prior to the hearing on such amendment."

Section 33367 provides, in pertinent part: "The ordinance shall contain all of the following: [¶] . . . [¶] (d) The findings and determinations of the legislative body that: [¶] (1) The project area is a blighted area, the redevelopment of which is necessary to effectuate the public purposes declared in this part."

[6] Here is the entirety of the text of section 33368: "The decision of the legislative body shall be final and conclusive, and it shall thereafter be conclusively presumed that the project area is a blighted area as defined by Section 33031 and that all prior proceedings have been duly and regularly taken. [¶] This section shall not apply in any action questioning the validity of any redevelopment plan, or the adoption or approval of a redevelopment plan, or any of the findings or determinations of the agency or the legislative body in connection with a redevelopment plan brought pursuant to Section 33501 within the time limits prescribed by Section 33500."

Besides which, to adopt the city's expansive interpretation of section 33368 would read section 33457.1 right out of the statute books.

Our opinion should not, however, be read to establish an automatic rule to the effect that any time a power of eminent domain is added to a redevelopment plan, a new finding of blight is ipso facto "warranted." We need not, and do not, go that far in this decision.[7] It is enough to say that under the facts *here*, a new blight finding was certainly "warranted."

## II. FACTS

In June 1988, the Orange County Board of Supervisors passed an ordinance adopting the "Neighborhood Development and Preservation Project" (Neighborhood Preservation Project), which was designed to redevelop 14 unincorporated subareas of Orange County. One of the unincorporated subareas within the Neighborhood Preservation Project was the El Toro Project Area.

The Neighborhood Preservation Project set forth the scope of the powers of the redevelopment agencies for the various subdivisions on both a general and a specific level. The *general* power granted was broad enough to allow the controlling agencies for each zone to address the unique needs of that area. But within each subdivision, there were *specific* restrictions on the general power, limiting the scope of the redevelopment.

---

[7] Certain federal authorities could arguably be read for the proposition that the constitutional *public use* requirement means that there must be a current finding of *blight* anytime the eminent domain power is added to a redevelopment plan, because without a finding of blight, redevelopment, when it involves the power of eminent domain, devolves into nothing more than taking private property for a purely private use, i.e., simply taking it from one landowner and giving to it another. (See *Cottonwood Christian Center v. Cypress Redevelopment Agency* (C.D.Cal. 2002) 218 F.Supp.2d 1203, 1228–1229; *99 Cents Only Stores v. Lancaster Redevelopment Agency* (C.D.Cal. 2001) 237 F.Supp.2d 1123; see also Tepper, *Federal Court Limitations on Redevelopment Agencies* (March 2004) 27 L.A. Law. 12; accord, *Hawaii Housing Auth. v. Midkiff* (1984) 467 U.S. 229, 245 [81 L.Ed.2d 186, 104 S.Ct. 2321] ["A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void."]; *Armendariz v. Penman* (9th Cir. 1996, en banc) 75 F.3d 1311, 1321 [no judicial deference afforded where public use finding is demonstrably pretextual]; *Cottonwood Christian Center, supra*, 218 F.Supp.2d at pp. 1229–1230 ["Defendants' planning efforts here appear to consist of finding a potential landowner for property that they did not own, and then designing a development plan around that new user."].) Because we have determined that a new finding of blight was indeed warranted by the *particular facts in this case* and that finding was *statutorily* authorized, we are spared the necessity of addressing these federal authorities, or any arguable *constitutional* implications from the facts of the case before us.

Out of the 14 zones covered by the Neighborhood Preservation Project, the El Toro Project Area was the zone *least* in need of traditional redevelopment. The main idea for redevelopment was to obtain tax revenue with which to ease traffic congestion in the area's main arteries by expanding street width.[8] Traffic volumes had, after all, nearly doubled at many intersections at El Toro Road in the previous 10 years (i.e., previous to 1988). The administrative record of those early proceedings shows the area suffered from few dilapidated or deteriorated structures.[9]

The primary motivation for including the El Toro Project Area within the Neighborhood Preservation Project was thus not to revitalize the private commercial centers along the El Toro corridor. Rather, the clear focus of the plan was to provide roadway and ancillary public infrastructure improvements. And because of that focus, the original plan did not include eminent domain power. In fact, the county's redevelopment agency, in a report to county supervisors, *expressly disavowed* the eminent domain power. The report said the agency had "determined that it can achieve the objectives of this project without the use of eminent domain."

In 1991, about three years after the Neighborhood Preservation Project was adopted, a subdivision of the greater El Toro Project Area, now known as Lake Forest, was incorporated. In 1998 jurisdiction over the El Toro Project Area was transferred to the city's redevelopment agency.

The early 1990's was a time of great development and growth for many southern Orange County territories surrounding Lake Forest, and due to rapid retail growth in neighboring cities, the city lost much of its regional sales tax revenue to businesses in bordering towns. In fact, retail sales in the jurisdiction declined by some 30 percent during the period, being lost to shopping centers in neighboring towns. As noted by the trial judge, it was this decline in sales and a desire to "reclaim its share of the regional sales tax pie" that prompted the city to try to "revitaliz[e]" the El Toro Project Area.

---

[8] The original report to the county supervisors said: "El Toro Road is characterized by enormous traffic volumes and chronic congestion. Traffic volumes at many intersections at El Toro Road have nearly doubled in just the last 10 years. [¶] . . . . Although this list of needed improvements to El Toro's circulation system is absolutely essential to adequate[ly] serve the existing demands placed on these arterials, there are no adequate funds presently available in the county to pay for these public improvements. *It is here where the Orange County Development Agency can utilize the provisions of California Health and Safety Code § 33670 to provide the mechanism for financing these public improvement projects.*" (Italics added.)

Section 33670 allows for redevelopment agencies to gain a share of property tax revenues.

[9] The report to the county supervisors noted that there was only one "dilapidated" and eight "deteriorated" structures in the entire El Toro Project Area, and of the eight "deteriorated" structures, half (four) were single family dwellings.

Thus, the city devised and adopted the Amended and Revised Redevelopment Plan (Amended Plan) on May 21, 2002 by passing Ordinance No. 125. The focus of the Amended Plan was on revitalizing "commercial and industrial properties while improving and maintaining the residential portion of the Project Area." This plan would be quite costly and would affect a large number of properties in the surrounding area. Perhaps realizing that it could have some trouble obtaining consent from various affected property owners, the city included the power of eminent domain in the Amended Plan.[10]

The basic reason for the amendment was to condemn two of the major shopping centers in the El Toro Project Area, the Saddleback Valley Plaza (the Plaza) and K-Mart shopping center (the Center) because they were underproducing sales tax revenue. Neither center had been labeled (or could be rationally labeled) "deteriorated or dilapidated" in the Neighborhood Preservation Project, though one could easily imagine either center improved with some upscale remodeling, or maybe some South Coast Plaza style causeways. The city, however, concluded it would be impossible for the individual owners of the properties to bear the financial burden of remodeling the centers.

Within less than three weeks (closer to two) of the city's passage of Ordinance No. 125 in May 2002, plaintiff Harvey Boelts, who has an interest in one of the centers, filed a validation action to review the validity of the amendment. (See Code Civ. Proc., § 860 et seq.) Boelts complained that six of the findings the city made to justify Ordinance No. 125—including the finding that the El Toro Project Area was physically and economically blighted—were not supported by substantial evidence. Boelts sought equitable relief in the form of a prohibitory injunction blocking the city from expending any further money on the project until the Amended Plan was properly supported by findings required under the Community Redevelopment Law.

The trial court ruled that the record lacked substantial evidence to support the challenged blight finding. The court specifically ruled that the addition of eminent domain power to the Amended Plan was a material and substantial change to the original Neighborhood Preservation Project, *warranting* new findings of blight. The court said that the Amended Plan "changes the Plan from encouraging, facilitating, and assisting property owners with improving their own property, to allowing the Agency to take private property from its owner to be conveyed to a third party developer." As a result of the newly

---

[10] The city also included a negative declaration, instead of requiring a formal environmental impact report. The trial court concluded that the negative declaration was proper under the California Environmental Quality Act (CEQA). Boelts filed a cross-appeal challenging that determination, but later requested dismissal of that cross-appeal, which request we now grant. Accordingly, this opinion in no way addresses the negative declaration or CEQA issues.

added eminent domain power, and because of the amplification of the revised project, the trial court ruled that an additional finding of blight needed to be made (pursuant to sections 33457.1 and 33367, quoted in pertinent part in footnote 5 above).

The trial court further found there had been significant changes in the environmental and economic climates in the El Toro Project Area in the intervening 14 years. The court opined that the particular blight findings from the original Neighborhood Preservation Project were made under dramatically different circumstances and were insufficient to support the amendment. Finding the evidence to support the Amended Plan insufficient, the court issued an injunction ordering the city to "refrain from expending any funds on implementation of the Amended and Restated Redevelopment plan until Amended/Restated Plan is lawfully adopted." It is from this order that the city appeals.[11]

## III.  DISCUSSION

### A.  *Section 33368 Does Not Preclude Timely Challenges to New Blight Findings When Those Findings Are Warranted by Section 33457.1*

#### 1.  As Shown by the Internal Structure of the Redevelopment Law

The city's centerpiece argument is that, under section 33368, once an *initial* finding of blight is made and the time to challenge *that* blight finding has elapsed (60 days, as specified in section 33500), blight is conclusively established regardless of whether the plan is subsequently amended and regardless of whether there is substantial evidence to support a blight finding warranted by that amendment.

We have concluded that the city's argument is based on a misreading of section 33368. The city's mistake is to read section 33368 in total isolation,

---

[11] The day before oral argument was to be held, Boelts withdrew his opposition to the appeal and abandoned his cross-appeal as to CEQA issues (see footnote 10 *ante*). However, there is no indication of a settlement of the case, or a stipulation by the parties to reverse the trial judgment (cf. Code Civ. Proc., § 128, subd. (a)(8) [standards for accepting stipulated reversals of trial court judgments]). Despite his withdrawal, it isn't, of course, as if respondent Boelts had failed to file a brief at all—we have the benefit of thorough and excellent briefing from all sides. Even so, the legal dynamics are the same as if Boelts simply had failed to file a respondent's brief. This court is still obligated to determine whether the *appellant*—here the city—has shown reversible error. (See Cal. Rules of Court, rule 17(a)(2); *In re Marriage of Davies* (1983) 143 Cal.App.3d 851, 854 [192 Cal.Rptr. 212] ["the respondent's failure to file does not require an automatic reversal"]; *In re Marriage of Bukaty* (1986) 180 Cal.App.3d 143, 147 [225 Cal.Rptr. 492].)

instead of in the whole context of the Community Redevelopment Law. (See *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 60 [124 Cal.Rptr.2d 507, 52 P.3d 685] [noting that legislative intent behind particular section in Code of Civil Procedure statute had to be " ' "gleaned from the statute as a whole" ' "]; *People v. Acosta* (2002) 29 Cal.4th 105, 112 [124 Cal.Rptr.2d 435, 52 P.3d 624] [" 'We do not, however, consider the statutory language "in isolation" . . . . Rather, we look to "the entire substance of the statute . . . in order to determine the scope and purpose of the provision." ' "]; *People v. Murphy* (2001) 25 Cal.4th 136, 142 [105 Cal.Rptr.2d 387, 19 P.3d 1129] ["We must harmonize 'the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole.' "].)

■ In context, section 33368 is part of the general procedures for the adoption of an initial redevelopment plan by a local legislative body. (See § 33360 et seq.) Immediately preceding the statute is section 33367, and subdivision (d) of section 33367 requires a number of various findings, including that the "project area is a blighted area." The "conclusive presumption" language of section 33368 is also the culmination of a series of preceding statutes "replete with preliminary requirements for notice and public hearings," in which the taxpayer is given "ample time" to "prepare legal challenges to the actions of redevelopment agencies." (See *Plunkett v. City of Lakewood, supra,* 44 Cal.App.3d at p. 347.)

A redevelopment plan can last as long as 40 years. (§ 33333.6, subd. (a).) Obviously many things can happen in 40 years that might necessitate some change in a plan. (See § 33450 [providing in part, "If at any time after the adoption of a redevelopment plan for a project area by the legislative body, it becomes necessary or desirable to amend or modify such plan, the legislative body may by ordinance amend such plan upon the recommendation of the agency."].)

And that raises the need for amendments. Amendments have their own article, article 12, in the Community Redevelopment Law, of which section 33368 is *not* a part. In many respects the process of amending a redevelopment plan in article 12 parallels the process of adopting an original one as specified in article 5 (procedures for adopting a redevelopment plan). Thus section 33450 not only confers basic authority to amend redevelopment plans, but explicitly makes them subject to referenda. (See § 33450 ["Except as otherwise provided in Section 33378, the ordinance shall be subject to referendum as prescribed by law for the ordinances of the legislative body."].) And, as with original plans, the statutes governing amendments are "replete with preliminary requirements for notice and public hearings" (see §§ 33451, 33452, 33454; see also §§ 33455, 33458) plus specific notice to local planning commissions (§§ 33453, 33455).

Following these notice and hearing statutes comes section 33457.1.[12] In section 33457.1's requirement that the amending ordinance contain certain findings, it functions as the amending analog to section 33367. Indeed, section 33457.1 appears to be the only statute within article 12 (governing amendments to redevelopment plans) that, like section 33367 in the context of initial redevelopment plans, imposes *substantive* requirements. Unless we blinked, all the other statutes in article 12 are procedural.[13]

Section 33457.1 is the soul of brevity, because all the heavy lifting is done by incorporation by reference, specifically to section 33367, the section which, we have seen, imposes substantive requirements on initial redevelopment plans, including the need for a finding of blight. The key phrase for our purposes, though, is the introductory clause, which makes the impositions of the section contingent on being "warranted." ("To the extent warranted by a proposed amendment to a redevelopment plan, (1) the ordinance . . . shall contain the findings required by Section 33367" (§ 33457.1).)

The city offers no refutation for the idea, unmistakable in the structure of section 33457.1, that, given the word "warranted," there will indeed be at least *some* circumstances where a blight finding under section 33457.1 (incorporating by reference section 33367) will indeed be "warranted" by a proposed amendment.[14]

---

[12] However, the last statute in the article, 33458, is also a hearing provision, to wit, an alternative public hearing provision.

[13] Section 33450 speaks of it being "necessary or desirable" to amend a redevelopment plan, but doesn't otherwise shed any light on the context of "necessary or desirable," and in any event those words are probably so elastic as not to impose any substantive requirements. Sections 33451 and 33452 are strictly devoted to notice and hearings, section 33453 to notice to local planning commissions, section 33454 is a public hearing requirement, section 33455 is an elaboration on local planning commission involvement and the need for public hearings, section 33456 allows recordation, section 33457 requires transmission of the amendment to tax officials, and section 33458 provides for yet more public hearings. Only section 33457.1, with its express need to "contain findings required by Section 33367," if warranted, imposes substantive requirements on the *contents* of an amendment.

[14] At one point in the city's brief it asserts that "Under no circumstances do the statutes of the Community Redevelopment Law require a community to re-establish blight to the levels suitable for original plan adoption for an existing redevelopment project area." There is no authority offered for this statement, though there is a footnote qualifying it for cases (see §§ 33031, 33354.6) when new territory is added. (Appellant's opening brief at p. 19.) No attempt is made to confront section 33457.1 either. To the degree that the statement relies on the phrase "suitable for original plan adoption" as its escape route from the plain operation of section 33457.1, it is simply contrary to the plain text of section 33457.1, which says "findings required by Section 33367," not "merely in the same ballpark as the findings required by Section 33367." To the degree the phrase "suitable for original plan adoption" is simply another way of reiterating the city's position that original blight findings are conclusive no matter what, we deal with that in the next several paragraphs in the text.

The city's model of the redevelopment statutes seems to be that once a blight finding is made pursuant to section 33367, the fact of blight is, given the "conclusive" presumption of section 33368, etched in stone for the duration of the redevelopment plan. Or, as the city metaphorically describes its position in its reply brief, there is no such thing as a " 'disappearing' conclusive presumption." (See reply brief at p. 26.)

The core problem with the city's expansive reading of section 33368 is that it elbows section 33457.1 right out of the statute books.

Courts do not adopt interpretations of statutes which render some sections surplus or null. (E.g., *Elsner v. Uveges* (2004) 34 Cal.4th 915, 931 [22 Cal.Rptr.3d 530, 102 P.3d 915] ["We will avoid constructions that render parts of a statute surplusage."]; *Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 22 [56 Cal.Rptr.2d 706, 923 P.2d 1] ["Courts should give meaning to every word of a statute if possible, and should avoid a construction making any word surplusage."].)

For example, in *California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 633–634 [59 Cal.Rptr.2d 671, 927 P.2d 1175], our high court considered the interpretation of a particular Education Code section involving vacancies for athletic coach jobs, which essentially said that such vacancies should "first be made available to teachers presently employed by the district." The school district, however, was intent on filling an assistant basketball coach vacancy with someone who did not have a teaching credential. So the district took the position that the statute merely required it to advertise openings for coach positions to teachers currently employed in the district and allow credentialed teachers to apply for such positions, but not give such teachers any other advantages in the employment process. (*Id.* at p. 632.)

Our high court rejected such a parsimonious reading of the statute, and one of the reasons it did was because the district's interpretation rendered the statute a "nullity." The statute afforded teachers "no greater rights than they would have in the absence of the statute." (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist., supra,* 14 Cal.4th at p. 634.)

So it is in the case before us. The city's reading of section 33457.1 renders the requirement of a blight finding, at least when such a finding is "warranted," mere surplusage. As in *California Teachers Assn.*, the result (insofar as warranted blight findings are concerned) is no different "in the absence of the statute."

## 2. As Shown by the Text of Section 33368

In specific statutory (as distinct from structural) terms, the city's proffered reading reads the word "warranted" out of the statute. If, under section 33368, blight findings are "conclusive" for the entire duration of a redevelopment plan, a requirement of subsequent blight findings pursuant to a proposed amendment (as authorized by section 33457.1, if warranted) becomes meaningless. The Legislature could repeal section 33457.1 and it would make no difference.[15] The city is, in essence, saying that under no circumstances are *meaningful* blight findings (that is, blight findings that might have a legal consequence on an amendment to a redevelopment plan) ever warranted.

Section 33368 was first enacted in 1963 (see Stats. 1963, ch. 1812, p. 3694). Section 33457.1 was first enacted in 1977. (See Stats. 1977, ch. 797, § 12, p. 2446.) To the degree that, for sake of argument, there is an irreconcilable conflict between the two statutes, it is the earlier (§ 33368) that must give way to the later (§ 33457.1). (See *People v. Franklin* (1997) 57 Cal.App.4th 68, 74 [66 Cal.Rptr.2d 742] ["where two statutes addressing the same subject are irreconcilable, the later in time will prevail over the earlier"]; *Los Angeles Police Protective League v. City of Los Angeles* (1994) 27 Cal.App.4th 168, 178 [32 Cal.Rptr.2d 574] ["When two acts governing the same subject matter cannot be reconciled, the later in time will prevail over the earlier."].) Thus if section 33368 really does, as the city propounds, establish an etched-in-stone-until-the-end-of-the-plan rule, it must give way to the extent that, under section 33457.1 when warranted, substantive blight findings are required for an amendment.

■ However, the two statutes are readily reconciled simply by realizing that by its own terms section 33368 does not apply to timely validation actions (that is, validation actions brought within the time limits of section 33500), and that such timely validation actions can be brought after a redevelopment plan has been amended. When one reads the second paragraph of section 33368 and its specific reference to section 33500,[16] together with the fact that section 33500 explicitly allows for (timely) validation actions to *amendments* to redevelopment plans and also considers itself declarative of

---

[15] There is a remarkable section of the city's opening brief which attempts to undertake the point that the city felt itself *politically* constrained by section 33457.1 to make blight findings in 2002, though it did not consider itself *legally* bound to do so. That's the same kind of argument that our high court rejected in *California Teachers Assn.,* i.e., one which reduces a statute, obviously intended by the Legislature to create substantive rights, to symbolic pantomime.

[16] "This section shall not apply in any action questioning the validity of any redevelopment plan or the adoption or approval of a redevelopment plan, or any of the findings or determinations of the agency or the legislative body in connection with a redevelopment plan brought pursuant to Section 33501 within the time limits prescribed by Section 33500."

existing law,[17] the conclusion becomes inescapable that section 33368 by its own terms does not reach validation actions attacking amendments to redevelopment plans based on blight findings that were "warranted" pursuant to section 33457.1.

### 3.   As Shown by Common Sense and Common Law

■   The picture of the law that thus emerges is exactly what one would expect if one were sitting down and thinking out the problem of redevelopment and the need to make amendments to redevelopment plans on a clean slate. The Legislature has recognized that a lot can happen in 40 years and has made allowance for amendments to redevelopment plans which, when warranted, require new findings of blight. To be true, original blight findings remain conclusive under section 33368 *until* a timely validation action brought pursuant to an amendment (if such findings are warranted under section 33457.1), but, by the very terms of section 33368, *only* until then.

That internal limitation makes particular sense when one realizes, as the *Plunkett* court did, the purpose for the short statute of limitations in section 33500, after which section 33368 makes the blight finding conclusive. That purpose, as noted above, is to prevent needless public expenditure or private relocation in reliance on a redevelopment plan. (See *Plunkett v. City of Lakewood, supra,* 44 Cal.App.3d at p. 347.) An amendment to such a redevelopment plan, however, may implicate new public expenditure or, as in the case before us, private relocation not contemplated when the plan was originally developed. Thus it would make sense to build in the possibility of validation actions to amendments.

By the same token, the statutory scheme accords with elementary fair play, as shown by *Redevelopment Agency v. Herrold* (1978) 86 Cal.App.3d 1024 [150 Cal.Rptr. 621]. *Herrold* is a common law repudiation of the idea that redevelopment agencies can sandbag adversely interested parties by sneaking in a finding (in that case a public use finding) supporting an original redevelopment plan when no one has an interest in challenging it, and then, years later, claiming that the time limits of section 33500 insulate that finding from judicial review.

---

[17] "No action attacking or otherwise questioning the validity of any redevelopment . . . amendment to a redevelopment plan, or the adoption or approval of such . . . amendment, or any of the findings or determinations of the agency or the legislative body in connection with such plan shall be brought prior to the adoption of the redevelopment plan at any time after the elapse of 60 days from and after the date of adoption of the ordinance . . . amending the plan. [¶] The amendments made to this section at the 1977–78 Regular Session of the Legislature do not represent a change in, but are declaratory of, existing law."

In *Herrold*, a redevelopment agency filed an eminent domain complaint to acquire an owner's property, which the owner thought was a mere attempt to transfer his property to a private company located across the street. So, in the eminent domain proceeding the owner served written interrogatories asking the redevelopment agency its intended use of the property and whether the agency had entered into an agreement to sell his property to the private company across the street. The agency refused to answer on the theory that the owner was foreclosed from questioning the validity of its proposed public use because the 60-day time limits under section 33500 had long elapsed. (See *Redevelopment Agency v. Herrold, supra*, 86 Cal.App.3d at p. 1027.) While the court doesn't say so, it appears from the opinion that the original redevelopment plan had been adopted eight years prior to the condemnation proceeding. (See *id*. at p. 1029.) The trial court denied the owner's motion to compel further interrogatories based on the lapsed time limits. (See *id*. at p. 1028.)

The appellate court was particularly influenced by the sandbagging inherent in the use of section 33500 to preclude the owner's challenge, particularly given a later deviation from the original redevelopment plan. Here is the relevant passage:

"The 60-day limitations period in section 33500 does not apply to the type of challenge appellant is making here because he is not attacking the legality of the redevelopment plan *as originally adopted*, but is questioning the implementation of the plan with respect to his property. *Appellant had no reason to object when the plan was adopted*. It was *not apparent at that time that the agency might be deviating from its resolved purpose* and planning an illegal use for the property (the sale to [the company across the street]) until eight years after the plan's adoption. Section 33500 cannot be used to immunize an agency which adopts a redevelopment plan legal on its face, then after the 60-day period has elapsed *deviates from its resolved purpose* and seeks to violate the public use requirement of California Constitution article I, section 14, and the 14th Amendment of the United States Constitution. Section 33500 applies only to attacks on the redevelopment plan as adopted, and not to actions alleging illegal implementation of the plan." (*Redevelopment Agency v. Herrold, supra*, 86 Cal.App.3d at p. 1029, italics added.)

To be sure, *Herrold* is not totally on point; the owner's challenge was to a public use finding that is explicitly required by our state Constitution, while here the challenge is to a blight finding that might—or might not—be required by the state or federal Constitution.[18] Even so, the underlying

---

[18] See footnote 7, *ante*.

common law abhorrence of bait and switch in the redevelopment context permeated the *Herrold* court's decision.

Here, as in *Herrold*, for example, property owners who might have been alerted to the need to challenge the original blight findings may have been lulled into acquiescence because those findings only supported a county's redevelopment plan focused on traffic and without the power of eminent domain: "Don't worry about our proposed blight finding, it's only a technicality to get roads widened" was followed by, 14 years later, "You had your chance to challenge our blight finding 14 years ago, now you're stuck with it even though we want to use eminent domain to take away your property." It might not be worth the effort to fight a blight finding when all it means is that some congested roads are widened; it certainly is worth the effort if it means the loss of one's property.

Functionally, the public use issue in *Herrold* is equal to the blight issue here. Thus, as in *Herrold*, Boelt's challenge in the proceeding before us is not to the "legality" of the county's plan "as originally adopted" but to the "legality" of a city's plan that deviates in its "resolved purpose" (14 years earlier the purpose was the elimination of traffic congestion) and in its powers (14 years earlier there was no power of eminent domain) from the original plan. Such facts well illustrate why the Legislature would build into the statutory structure of redevelopment a mechanism by which an affected property owner could timely challenge a blight finding if warranted by an amendment. To read section 33368 (in conjunction with the short time limits prescribed in section 33500) to preclude *any* challenge to a blight finding after an original plan is adopted is a recipe for abuse of the power of redevelopment.

### B. *Judicially Reviewable Blight Findings Pursuant to Section 33457.1 Were Warranted in This Case*

Having staked its case on the theory of an absolute presumption of blight under section 33368—the idea of "once established, always established"—it is not surprising that the city goes a little lite on the topic of whether judicially reviewable blight findings here were warranted. It makes a novel argument that blight findings were "politically" but not "legally" warranted (see appellant's opening brief at pp. 30–32),[19] but that argument is only a permutation of the idea that blight once found is, under section 33368, forever found (or at least until the termination of the plan).

---

[19] It has been the traditional practice of the federal courts to make specific references to the briefs and the record in their opinions; it is much rarer in our state's own reporters. However, briefs are now available on-line, and there is at least some merit to the idea that scholars should be able to compare what the brief says with what the court says the brief says.

Suffice to say that, to track the language of section 33457.1 here, "the findings required by Section 33367" were indeed warranted. In that regard we will not attempt to improve on trial Judge Jameson's thorough and thoughtful statement of decision, which we will now adopt as our own statement of reasons on the point:

"The Court finds that the Challenged Findings were warranted by the adoption of the Amended and Restated Plan. In its ordinance, the Lake Forest City Council expressly found that the Challenged Findings were warranted pursuant to Section 33457.1 . . . Even absent the Defendants' City's own legislative determination that the blight (and other) findings were warranted,[20] the Court nevertheless finds that the Challenged findings were warranted. Since the Challenged Findings were warranted, Defendants are required to support them with substantial evidence. [¶] Neither the record nor the Community Redevelopment Law supports Defendants' assertions that the findings made by the City were unnecessary. Adding the extraordinary power of eminent domain to the redevelopment plan by amendment was material and significant. The record demonstrates that as originally adopted, the [Neighborhood Preservation Project]'s primary focus for the El Toro area was on infrastructure improvements. (See, eg. AR 1092-95.) This is because the El Toro area was relatively well maintained and, although it needed little in the way of building refurbishment, it had streets with congestion. With the exclusion of heavy traffic, the El Toro Project Area fared substantially better than any of the other remaining 13 redevelopment sub-areas that comprised the [Neighborhood Preservation Project]. In the entire El Toro Redevelopment Project Area, there was only one 'dilapidated' structure and eight 'deteriorated' structures. (AR 1046.) The Record demonstrates that the primary motivation for including the El Toro Project Area within the [Neighborhood Preservation Project] was not to revitalize the private commercial centers along the El Toro corridor, but to provide roadway and ancillary public infrastructure improvements . . . . [¶] Defendants have also characterized the Amendment as a 'minor' amendment which 'only' adds the power of eminent domain. The power of eminent domain is extraordinary. Adding the power is a material change to the Plan. It changes the Plan from encouraging, facilitating, and assisting property owners with improving their own property, to allowing the Agency to take private property from its owner to be conveyed to a third party developer."

We need only reiterate at this point that the particular circumstances in this case are so strong that we need not reach the issue of whether the addition of

---

[20] As one might expect, much of the city's briefing is directed at the proposition that it should not be stuck, estoppel-like, with its own determination that blight findings were warranted. Since we agree with the trial court that blight findings were objectively warranted regardless of what the city itself determined, we do not reach the issue.

eminent domain to a redevelopment plan, *by itself*, would "warrant" new blight findings under section 33457.1. As the trial judge noted (and it cannot be denied), the power of eminent domain is indeed an extraordinary one—certainly extraordinary enough to be the subject of a provision in the Bill of Rights. At least in *combination* with a "deviation" (to use the *Herrold* court's phrase) from the original plan that never expressly contemplated the need for eminent domain, was focused on traffic and was *not* concerned with the makeover of commercial buildings to marginally increase sales tax revenue, blight findings were certainly warranted in this case.

### C. *The Trial Court Correctly Concluded That the Evidence of Blight Was Insufficient to Support Blight Findings Pursuant to Section 33457.1*

The city candidly acknowledges that it did not attempt to justify the amendment adding eminent domain and reshifting the focus of the El Toro redevelopment plan from traffic to shopping center improvement based on any condition of blight present in 2002. And in fact the trial judge's statement of decision pretty much demolishes the idea that the El Toro Project Area suffers any blight at all. As the trial judge wrote, "Even if the record did contain some evidence of physical blight and/or economic blight, which it did not, the record nonetheless fails to provide substantial evidence of blight because the record does not contain substantial evidence that any of the alleged blighting conditions are so prevalent and so substantial that it causes a reduction of, or lack of, proper utilization of the area to such an extent that it constitutes a serious physical and economic burden on the community which cannot reasonably be expected to be reversed or alleviated by private enterprise or governmental action, or both without redevelopment."

Judge Jameson also noted that the city's statements about the alleged blight of the area were "conclusory," and recognized that "conclusory statements regarding blight . . . are inadequate to provide the substantial evidence necessary to support a blight finding," a point that is, of course, unassailable. (See *Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency*, *supra*, 82 Cal.App.4th at pp. 557-558 ["The language cited by the trial court from the Final Report is the conclusory type of 'jargon' courts have criticized as making 'no attempt at any specificity; the reasons appear to have emerged from the consultants' word processor without any thought as to why any particular parcel . . .' is blighted . . . ."]; *Beach-Courchesne v. City of Diamond Bar, supra*, 80 Cal.App.4th at p. 401 [" 'The city merely cites certain all-purpose conclusory statements from the consultants' report which might apply to any property anywhere.' "].)

Having had the benefit of the trial court's criticism, the city has a second chance to point to blight in this appeal. Here is its best shot:

(1) At one of the shopping centers in the area, there is "antiquated design and numerous vacancies."

(2) The same shopping center had 23 commercial spaces vacant.

(3) The same center showed "signs of deterioration and deferred maintenance."

(4) Conditions (1) through (3) are the result of "fractured ownership and a land lease without sufficient time remaining to economically fund revitalization or redevelopment of the center."

(5) Another shopping center, which once had a K-Mart, had not had an anchor tenant for more than eight years.

(6) This other shopping center is "in need of site reconfiguration to meet present retailing demands, and the need for an improved interconnection between that center and the adjoining center."

And that is it, at least as the city attempts to make the case for blight in its brief.[21] It is a showing that self-evidently pales into insignificance besides the showing that was itself held inadequate in the *Friends of Mammoth* case. There, to take just one example, a building survey determined that approximately 29 *percent* of parcels in the project area "were affected by buildings suffering from deterioration and dilapidation." (*Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency, supra*, 82 Cal.App.4th at p. 551.) Some of that "deterioration and dilapidation" was supported in *Friends of Mammoth* by a definition that included peeling paint, dry rot, deteriorated roofing, but there was an absence of evidence of lack of safety or unhealthiness for human occupancy. (See *id.* at pp. 551–552.) The present case involves fewer allegedly "deteriorated or dilapidated" buildings in the project

---

[21] See appellant's opening brief at pp. 36–38. The preceding portion of the city's brief (at pp. 34–35) offers no specific evidence, but speaks only generally in terms of the following (and only the following): "deterioration and dilapidation of commercial centers," "abnormally high vacancy rates," "fractured property ownership" "defective and antiquated design of the physical properties, including assessibility deficiencies" and "inadequate public improvements." Then the brief quotes factors that *can* "cause blight" under section 33031 subdivision (a) or (b). But the presence of a factor that can *cause* blight can hardly *by itself* justify a blight finding For example, section 33031, subdivision (a)(4) recognizes that "subdivided lots of irregular form and shape and inadequate size for proper usefulness and development . . . are in multiple ownership" is a condition that can indeed *cause* blight. However, no one could credibly argue that it is a condition that *necessarily* causes blight. Some of the most desirable real estate parcels on earth are characterized by irregular size and multiple ownership, e.g., Burgundy, France, where French inheritance laws keep making holdings smaller and smaller in the region.

area than one can count on two hands (and four of those buildings were merely single family homes), and the city makes zero attempt to shore up the (conclusory) assertions of dilapidation or deterioration as to even those nine buildings with any substantive content. It certainly makes no attempt to show any safety or health problems for those buildings. Nor does the city cite any evidence of health code violations, structural defects, or even declines in property values.[22]

## IV.   DISPOSITION

The judgment invalidating the amendment to the redevelopment plan adopted on May 21, 2002, is affirmed. In the interests of justice the respondent will recover his costs on appeal.

Aronson, J., and Ikola, J., concurred.

Appellants' petition for review by the Supreme Court was denied June 8, 2005.

---

[22] It is quite understandable why Lake Forest has not vigorously attempted to argue the sufficiency of its blight finding—this case isn't really, as were *Sweetwater*, *Friends of Mammoth*, or *Beach-Courchesne*, a sufficiency of evidence case. The city's briefing on the sufficiency issue impliedly recognizes that reality. The core issue is its proposition that the county's blight finding that went unchallenged in 1988 should be accorded conclusive effect in the context of a validation proceeding targeting the city's amendment in 2002.