[Nos. B180319, B182624. Second Dist., Div. Three. Mar. 1, 2006.]

ROBERT B. BLUE et al., as Trustees, etc., Plaintiffs and Appellants, v. CITY OF LOS ANGELES et al., Defendants and Respondents.

## Counsel

C. Robert Ferguson for Plaintiffs and Appellants.

Moskowitz, Brestoff, Winston & Blinderman, Barbara Blinderman and Dennis A. Winston for Hollywood Redevelopment Project Area Committee as Amicus Curiae on behalf of Plaintiffs and Appellants.

Rockard J. Delgadillo, City Attorney, Susan D. Pfann, Curt Holguin; Kane, Ballmer & Berkman, Murray O. Kane, June Ailin, Susan Y. Apy and Deborah L. Rhoads for Defendants and Respondents City of Los Angeles, City Council of the City of Los Angeles and the Community Redevelopment Agency of the City of Los Angeles.

Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, Patricia L. Glaser and Clare Bronowski for Defendant and Respondent Los Angeles Unified School District.

Grant T. Burton, Deputy General Counsel, for Defendant and Respondent Metropolitan Water District of Southern California.

OPINION

**KLEIN, P. J.**—Plaintiffs and appellants Robert B. Blue, Betty L. Blue individually and doing business as Ketro Company and as trustees for the Blue Family Trust (collectively, Blue or the Blues) and John Walsh (Walsh) (collectively, plaintiffs) appeal a judgment in a validation action in favor of defendants and respondents City of Los Angeles (City), City Council of the City of Los Angeles (City Council) (sometimes collectively referred to as the City) and the Community Redevelopment Agency of the City of Los Angeles (CRA) (collectively referred to as respondents). The judgment validates an amendment (hereafter, the first amendment) to the Redevelopment Plan for the Hollywood Redevelopment Project.[1]

Plaintiffs also appeal a postjudgment order denying their motion to strike or tax costs.[2]

The essential issues presented are whether the City and the CRA duly approved and adopted the first amendment to the Hollywood Redevelopment Plan, and whether respondents' findings of blight are supported by substantial evidence.

We conclude there was no procedural defect in the adoption of the first amendment and that substantial evidence supports the finding the project area remains blighted. The validation judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Earlier proceedings.*

On May 7, 1986, the City Council adopted Ordinance No. 161202, by which it adopted the Redevelopment Plan for the Hollywood Redevelopment Project Area (project area) pursuant to the Community Redevelopment Law (CRL). (Health & Saf. Code, § 33000 et seq.)[3] The redevelopment plan, inter alia, allowed the CRA a 12-year period to exercise the power of eminent domain to acquire real property in the project area for the public purpose of redevelopment and the elimination of blight.

---

[1] Hollywood Redevelopment Project Area Committee has filed an amicus curiae brief in support of plaintiffs.

[2] The two appeals were consolidated for purposes of oral argument and decision.

[3] All further statutory references are to the Health and Safety Code, unless otherwise indicated.

David Morgan (Morgan) and others filed a validation action challenging the adoption of the redevelopment plan.[4] In 1989, the trial court entered judgment in favor of the City and the CRA, finding that the redevelopment plan was valid. The judgment was affirmed by *Morgan v. Community Redevelopment Agency* (1991) 231 Cal.App.3d 243 [284 Cal.Rptr. 745] (*Morgan*).

In its discussion of blight, *Morgan*, which we set forth as part of the factual background, includes this description of the project area: "The community of Hollywood was originally a low-density residential area which now consists of old and deteriorating buildings, seriously overcrowded housing conditions and a substantial number of seismatically unsafe commercial buildings. There is a lack of adequate housing, open space and transportation. Twenty-five percent of the commercial structures suffer construction defects in that they were built with unreinforced masonry. [¶] The population of the project area increased 25 percent from 1970 to 1980; however, during the same period available housing only increased 2 percent. In 1980 approximately 5,000 households had 3 or more occupants but only 2,000 housing units had 2 or more bedrooms. Areas originally designed and built as low-density residential have been transformed into high-density multifamily dwellings. The project area is deficient in park land. [¶] The buildings are old and show deterioration. At least 36 percent of the single-family residences show deferred maintenance; an additional 27 percent require moderate to heavy rehabilitation. There is adult entertainment in close proximity to schools and residences. There are incompatible industrial uses in the area. [¶] Hotels and motels have shifted to use as transient rentals and regional retail uses have shifted to transient specialty shops. [¶] The project area is poorly subdivided making proper development difficult because of land ownership patterns. Land values have depreciated. There is a need for housing due to overcrowding, but 86 percent of the residential parcels are below the threshold size for development. Over 20 percent of the land parcels fail to meet minimum zoning standards. Ninety-two percent of the residential property is separately owned, but only six percent of the housing is owner-occupied. [¶] New development and reinvestment in the area is unlikely due to the low-income of residents and their inability to support higher rents. The project area does not have the ability to support the present level of government services. [¶] The reported crime rate for the project area is double the citywide rate. The street scene is dominated by youthful runaways and the homeless. Private revitalization of the area is highly unlikely." (*Morgan, supra*, 231 Cal.App.3d at pp. 255–256.)

---

[4] A validation proceeding (Code Civ. Proc., § 860 et seq.) is a lawsuit filed and prosecuted for the purpose of securing a judgment determining the validity of a particular local governmental decision or act. (*N. T. Hill Inc. v. City of Fresno* (1999) 72 Cal.App.4th 977, 991 [85 Cal.Rptr.2d 562].)

> 2. *Events relating to the adoption of the first amendment extending the CRA's power of eminent domain to acquire real property in the project area.*

While the *Morgan* action was pending, the CRA did not exercise the power of eminent domain due to the potential complications of exercising that power before the redevelopment plan was determined to be valid. By the time the judgment in *Morgan* became final in 1991, more than five years of the 12 years during which the CRA could have exercised the power of eminent domain had elapsed.

Pursuant to section 33333.4, subdivision (g)(2), which provides a redevelopment plan adopted before January 1, 1994 may be amended to extend the power of eminent domain, the CRA began processing the first amendment to the redevelopment plan in order to extend its eminent domain power for a 12-year period, limited to real property on which no persons lawfully reside.[5]

On April 30, 2003, the City Council and the CRA's Board of Commissioners held a joint public hearing regarding the adoption of the proposed first amendment to the Hollywood Redevelopment Plan.

On May 14, 2003, the CRA adopted resolutions: certifying that it had reviewed and considered the final environmental impact report (EIR) for the first amendment and adopting a mitigation plan and a statement of overriding considerations; approving the five-year implementation plan; and approving the first amendment and submitting the first amendment and the report prepared in connection therewith to the City Council for its consideration and approval.

On May 20, 2003, the City Council received additional comments on the proposed first amendment and ordinances Nos. 175235 and 175236. The council then adopted a resolution certifying it had reviewed and considered the final EIR for the first amendment and adopting a mitigation plan and a statement of overriding considerations. By 12-0 votes, the Council approved ordinance No. 175235, which deleted a time limit on incurring loans, advances and indebtedness for the Hollywood Redevelopment Project; and ordinance No. 175236, which adopted the first amendment to the redevelopment plan.

---

[5] The proposed first amendment included other matters as well: updating the redevelopment plan land use map to bring it into conformity with changes made to the Hollywood Community Plan (a portion of the City's general plan) after the adoption of the redevelopment plan; providing for conformance of the land use provisions of the redevelopment plan to future changes to the Hollywood Community Plan; rescheduling certain completion dates for various plans and studies mandated by the Redevelopment Plan; and correcting a date and certain time limits.

### 3. *The instant validation action*

On July 17, 2003, plaintiffs filed this validation action pursuant to Code of Civil Procedure section 860 et seq. A first amended complaint followed 12 days later before any party had answered. The City, the City Council and the CRA among others, answered the first amended complaint.

The first amended complaint raised the following issues regarding the adoption of ordinances No. 175235 and 175236 and the first amendment: respondents allegedly failed to make information regarding blight available prior to the joint public hearing on the first amendment (first cause of action); the CRA allegedly did not disclose the report to the City Council long enough before the joint public hearing for plaintiffs to exhaust their administrative remedies (second cause of action); the City Council's findings regarding (1) the presence of blight in the project area, (2) whether private enterprise acting alone would redevelop the project area and (3) the economic feasibility of the redevelopment plan allegedly were not supported by substantial evidence (third, fourth and fifth causes of action); respondents allegedly had violated the purposes of the CRL (sixth cause of action); respondents had not formed a new Project Area Committee or PAC, allegedly violating the CRL (seventh cause of action); and respondents had not responded in writing to written objections to the proposed first amendment (eighth cause of action). The ninth and tenth causes of action requested injunctive and declaratory relief for the alleged violations of the CRL.

The matter was tried on the administrative record, on the parties' trial briefs, and on oral argument, which was held on August 10, 2004.

The first amended complaint did not attack the finding in section 4.f. of ordinance No. 175236, which is the finding required by section 33367, subdivision (d)(6).[6] Following the hearing, the parties filed supplemental briefs related to plaintiffs' request for leave to amend to challenge said finding.

Upon review of the supplemental briefs, the trial court ruled "any such amendment at trial [is] inappropriate. Validation actions are subject to a 60-day statute of limitations and administrative remedies must be exhausted by someone during the processing of the redevelopment plan or amendment as to all issues that are to be raised in the complaint. The issues raised by Plaintiffs with regard to the finding made in Section 4.f. of Ordinance No. 175236 were not raised during the processing of the First Amendment.

---

[6] The finding required by section 33367, subdivision (d)(6) is: "*The condemnation of real property*, if provided for in the redevelopment plan, *is necessary to the execution of the redevelopment plan* and adequate provisions have been made for payment for property to be acquired as provided by law." (Italics added.)

There are no facts in this case . . . that would warrant holding Plaintiffs to a lower standard with regard to the requirement to exhaust administrative remedies."

### 4. *The validation judgment.*

On August 31, 2004, the matter was taken under submission. On November 10, 2004, the trial court issued an extensive minute order, ruling the first amendment to the redevelopment plan and related ordinances, and the procedures underlying their adoption, were legal and valid.

The order provides: "The Court notes that one of the plaintiffs, David Morgan, filed objections to the administrative record as certified by the CRA, but never followed the proper procedure to augment or otherwise correct the record; thus those objections are overruled.

"The record does not support plaintiffs' contention that they were denied a fair hearing or a reasonable opportunity to be heard because they did not receive certain raw data, including 'walker sheets.' No law or regulation is cited which requires the provisions of this data. Plaintiffs had access to all the data that was before the City Council, and demonstrate no entitlement to anything further. The Court also finds that plaintiffs were given a sufficient opportunity to review the information that was before the City Council. There is no legal requirement that parties have a specific amount of time to conduct such a review and here, the volume of comments plaintiffs did submit belies their contention that they had insufficient time to review and respond to the materials at issue. There is certainly no support for Morgan's request in his letter to the City Council in April 2003 asking that the joint public hearing be continued for three years . . . to allow adequate review of the data.

"The Court finds that no additional finding of blight was required in the adoption of the First Amendment. There is no authority cited to contradict defendants' position that the presumption created by Section 33368 of the Health and Safety Code remains in effect during the term of the project. However, there is substantial evidence in the record that blight remains in the area. . . . Thus, the third and fourth causes of action fail.

"As to the fifth cause of action, the Court finds there was no requirement of a finding regarding economic feasibility, since the First Amendment made no changes to the economics of the original plan. . . .

"The record as a whole does not support the contentions of the sixth cause of action, namely that the First Amendment and the ordinances violate the

'purposes of the community redevelopment law,' even if that is a cause of action cognizable in this proceeding, which is doubtful.

"The law does not support the seventh cause of action. Since the eminent domain power was clearly not to be used to acquire property in which persons were legally residing, as discussed in the letter from the City Attorney . . . , the law did not require the formation of a PAC. The record further indicates however that the community was significantly involved in this effort, and numerous organizations were consulted and provided comment. . . .

"Finally, the Court finds that no written responses to written objections were required (eighth cause of action)."

On December 9, 2004, the trial court entered a validation judgment upholding the first amendment and ordinances No. 175235 and 175236.

Blue and Walsh filed a timely notice of appeal from the validation judgment.[7]

## CONTENTIONS ON MAIN APPEAL

Plaintiffs contend the first amendment to the Hollywood Redevelopment Plan and ordinance No. 175236 are invalid because respondents did not acquire the power to adopt the first amendment in that: they unlawfully withheld the "Walker Sheets," which were the original evidence of blight; they denied plaintiffs and the public sufficient time to examine the report to the City Council; and they were required to form a Project Area Committee.

In addition, plaintiffs contend respondents' findings of blight were required or warranted but were not supported by substantial evidence to support the determination of blight; there is no evidence that blight cannot be reversed or alleviated by private enterprise acting alone; respondents failed to provide the information necessary to determine financial feasibility; and the subject ordinances unlawfully violate the purposes of the CRL (§ 33000 et seq.).

Amicus curiae's sole contention relates to the Walker Sheets. Amicus curiae contends respondents' intentional refusal to provide the data in its possession that are critical to the determination of whether substantial blight

---

[7] Validation proceedings are entitled to calendar preference. (Code Civ. Proc., § 867.) Accordingly, this court granted respondents' motion for calendar preference on appeal. (*Warren v. Schecter* (1997) 57 Cal.App.4th 1189, 1199 [67 Cal.Rptr.2d 573].)

exists in a redevelopment project area is an abuse of discretion and a denial of fair hearing sufficient to invalidate the first amendment to the redevelopment plan.

## DISCUSSION

### I. *STANDARD OF APPELLATE REVIEW.*

This court reviews de novo issues involving the interpretation and application of statutes (*Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 906 [100 Cal.Rptr.2d 173]), such as whether certain procedures must be followed in the adoption or amendment of a redevelopment plan.

However, on the question whether the findings made by the City Council are supported by substantial evidence, this court essentially applies the same standard of review as was applied by the trial court—whether the administrative record as a whole contains substantial evidence to support the findings made by the City Council. (*Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency* (2000) 82 Cal.App.4th 511, 537 [98 Cal.Rptr.2d 334]; *County of Riverside v. City of Murrieta* (1998) 65 Cal.App.4th 616, 619–620 [76 Cal.Rptr.2d 606].)

### II. *PROCEDURAL ISSUES.*

#### 1. *Lack of access to Walker Sheets is not a basis for invalidating the first amendment.*

##### a. *Overview.*

The Agency's analysis of physical blight was based in part on "Walker Sheets," which sheets contained data derived from field inspection of the project area by field surveyors who walked the area of the project. "The field survey undertaken by the [CRA] was conducted on a parcel-by-parcel basis, evaluating each major structure on the parcel, the condition of non-structural features on the parcel and the condition of other features located adjacent to the parcel. . . . [¶] The field survey instrument was designed to provide basic physical and economic information that could be derived by field inspection of the Project Area and to record information related to, or to facilitate the collection and application of secondary data to the blighting conditions as defined in the CRL."

In response to a request by Morgan[8] for the *Walker Sheets* and notes of survey takers, the CRA declined to turn over those materials, explaining: "The material and information you have requested constitutes the raw data and information that will become the basis of the blight analysis and other reports for the proposed amendment to the Hollywood Redevelopment Plan. In accordance with the provisions of Section 33352 of the [CRL], this information will be compiled and presented in tabular, graphic, or descriptive form for a report to the City Council. The report to the City Council will be made available for public inspection, . . . approximately 30 days prior to the joint public hearing by the Agency and the City Council on the proposed amendment to the redevelopment plan. . . . [¶] We will notify you when the report is available for inspection."

b. *Plaintiffs' contention.*

Plaintiffs contend respondents were obligated to make public the "Walker Sheets" and that without this "raw data, no one, other than City employees, could comment at the public hearing as to the condition of the structures," and the denial of access to this basic evidence "circumvented all of the underpinnings for creation of the exhaustion of administrative remedies doctrine."

c. *Plaintiffs failed to pursue their legal remedy to obtain access to the Walker Sheets.*

Amicus curiae acknowledges that those whose requests for documents were denied could have proceeded by way of writ pursuant to the California Public Records Act. (Gov. Code, § 6250 et seq.)

In view of the failure to pursue access to the Walker Sheets by way of the available remedy, the contention that denial of access to the Walker Sheets amounts to reversible error is unavailing.

---

[8] An individual challenging a redevelopment plan need not have personally raised each issue at the administrative level, but may rely upon issues raised or objections raised by others, so long as the agency had the opportunity to respond. (*Evans v. City of San Jose* (2005) 128 Cal.App.4th 1123, 1137 [27 Cal.Rptr.3d 675].) Therefore, it is sufficient that Morgan requested the Walker Sheets.

Morgan was a plaintiff below but is deceased.

> d. *No requirement the public be given access to the raw data on which the report to the City Council was based; the reports and information which were made available to the public satisfied the requirements of section 33457.1.*[9]

Additionally, as the trial court noted, plaintiffs do not cite any statute or regulation requiring the *raw data* on which the report to the City Council is based to be provided to the public.

Further, case law does not impose such a requirement. Plaintiffs and amicus curiae cite various cases in which field survey data was included in the administrative record and was used by the courts to reject or uphold findings of blight. (See, e.g., *Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency, supra,* 82 Cal.App.4th at pp. 549–550; *Beach-Courchesne v. City of Diamond Bar* (2000) 80 Cal.App.4th 388, 402 [95 Cal.Rptr.2d 265] (hereafter, *Diamond Bar*); *Evans v. City of San Jose, supra,* 128 Cal.App.4th at pp. 1146–1147.) However, the cited cases do not address whether the "raw data" regarding blight conditions must be furnished along with the report to the legislative body and they do not read such a requirement into the language of sections 33457.1 or 33352. In short, the cited cases do not stand for the proposition the raw data must be included in the report or elsewhere in the administrative record in order for a redevelopment plan to be found valid.

■ The statutory scheme specifies what information must be made available to the public. Section 33457.1 provides: "To the extent warranted by a proposed amendment to a redevelopment plan, (1) the ordinance adopting an amendment to a redevelopment plan shall contain the findings required by Section 33367 and (2) *the reports and information required by Section 33352 shall be prepared and made available to the public prior to the hearing on such amendment.*" (Italics added.) Turning to section 33352, it provides at subdivision (b) that the report to the legislative body, here, the City Council, must contain a description of the physical and economic conditions existing in the project area that cause it to be blighted, and a map showing where in the project area the conditions exist.

■ Under the statutory construction doctrine of *expressio unius est exclusio alterius,* " 'the expression of certain things in a statute necessarily involves exclusion of other things not expressed.' " (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1391, fn. 13 [241

---

[9] The Walker Sheets were not provided to the City Council or the CRA board either. Plaintiffs and the public had access to the same information regarding blight that was provided to the City Council and the CRA board, namely, the report and maps specified in section 33352.

Cal.Rptr. 67, 743 P.2d 1323].) Here, section 33457.1 specifies the reports and information that *"shall be . . . made available to the public"* (§ 33457.1, italics added) prior to the hearing on a proposed amendment to a redevelopment plan. Had the Legislature intended to require the raw data underlying the reports also be made available to the public, "it plainly knew how to do so." (*Rojo v. Kliger* (1990) 52 Cal.3d 65, 75 [276 Cal.Rptr. 130, 801 P.2d 373].)

The reports and information which were made public satisfied the requirements of sections 33457.1 and 33352. Physical conditions that cause blight were listed at administrative record (AR) 587 to 589,[10] economic conditions causing blight were listed at AR 649 to 651,[11] and maps identifying the blighted parcels are found at AR 564, 606, 607, 610, 681, 682.[12]

> e.  *In any event, lack of access to the Walker Sheets did not preclude plaintiffs from commenting on the physical condition of the subject area.*

Admittedly, had the Walker Sheets been made available to plaintiffs or the public, that would have facilitated their participation in the public hearing. However, we reject plaintiffs' contention the lack of access to the Walker Sheets precluded plaintiffs from commenting at the public hearing on the condition of the structures in the project area. A mere review of the Walker Sheets would not enable the reader to determine whether the Walker Sheets, or the summary thereof as compiled in the report to the City Council,

---

[10] The summary of *physical blighting conditions* included: *buildings in which it is unsafe or unhealthy for persons to live or work* (50 percent of buildings in project area in need of at least moderate rehabilitation and 13 percent in need of extensive rehabilitation or are dilapidated); and *factors that prevent or substantially hinder economically viable use or capacity of buildings or lots* (lack of onsite parking, substandard design; adjacent or nearby incompatible uses, subdivided lots of irregular form and shape and inadequate size for proper usefulness and development in multiple ownership).

[11] The summary of *economic blighting conditions* included: *low levels of building permit activity*; *low property sale prices* (property values lagged behind those for similar properties elsewhere); *high office vacancy rates* (overall vacancy rate of 27 percent) and *declining office lease rates*; *residential overcrowding* (population density more than three times higher than population density for City of Los Angeles); and *high crime rates* (project area attracts teen runaways, youth gangs active in the area; illegal drug trafficking and prostitution; members of large homeless population often resort to crime for survival and are vulnerable to others bent on crime; crime rate for robberies is 40 percent higher, overall crime is 52 percent higher, and aggravated assault 157 percent higher than crime rates for the City).

[12] The various maps of the project area identified *parcels exhibiting physical and/or economic blight*; the *building condition of each parcel* (sound, deferred maintenance, moderate rehabilitation, extensive rehabilitation, or dilapidated); *overall parcel condition* (sound, deferred maintenance, or deteriorated); *location of adult-oriented businesses*; *properties exhibiting graffiti and/or vandalism*; and *presence of security measures* (property with security bars, razor and/or barbed wire installed).

accurately described the physical condition of the project area. As respondents point out, the real "raw data" was not the "Walker Sheets," but rather, the existing conditions at the properties in the project area. By inspecting the project area themselves, plaintiffs could have made their own assessment as to the accuracy of the information regarding conditions in the project area as set forth in the report to the City Council. The lack of access to the "Walker Sheets" did not preclude plaintiffs from commenting on the existence or extent of physical blight in the project area and is not a basis to invalidate the first amendment to the redevelopment plan. (Code Civ. Proc., § 866.)[13]

### 2. *No merit to plaintiffs' contention they were denied sufficient time to review the report to the City Council.*

Plaintiffs contend respondents failed to permit them and the public sufficient time to examine the report to the City Council.

On February 18, 2003, the CRA indicated the report to the City Council would be made available for public inspection approximately 30 days prior to the joint public hearing scheduled for April 30, 2003. That did not occur. The report was transmitted to the City Council on April 16, 2003, 14 days before the hearing, and became available to the public at around the same time.

■ Section 33457.1 requires the reports and information required by section 33352 for a proposed amendment to a redevelopment plan "shall be . . . made available to the public *prior to* the hearing on such amendment." (§ 33457.1, italics added.) However, there is no specification as to how long before the hearing the materials must be made available to the public.

With respect to the issue of a continuance, prior to the hearing Morgan submitted 34 pages of written comments which included a request that "the joint public hearing be continued for three years to allow the affected owners and tenants to review all documents of plan amendment." The request for a three-year continuance was outlandish, clearly was dilatory, and properly was refused.

Further, leaving aside Morgan's unreasonable request before the hearing for a three-year continuance, this court has reviewed the transcript of the joint public hearing on April 30, 2003. The transcript reflects there was no request at the hearing for a continuance and that none of the persons who presented comments at the hearing (including Walsh and Robert Blue) asserted there had been insufficient time to review the report to the City Council. In the

---

[13] Code of Civil Procedure section 866, relating to validation proceedings, provides: "The court hearing the action shall disregard any error, irregularity, or omission which does not affect the substantial rights of the parties."

absence of a reasonable request by anyone for a continuance of the joint public hearing, plaintiffs cannot complain the matter proceeded on April 30, 2003.

Also, the materials which plaintiffs needed to review prior to the hearing were not as voluminous as it might appear. The entire report to the City Council spans about 826 pages. Of the 826 pages, 546 pertain to the EIR. The public hearing on the draft EIR for the plan amendment already had taken place on December 19, 2002, and no issues regarding compliance with the California Environmental Quality Act or CEQA (Pub. Resources Code, § 21000 et seq.) are being raised with regard to the adoption of the first amendment.

Further, as the trial court noted, plaintiffs and other members of the public submitted extensive comments, which "belies their contention that they had insufficient time to review and respond to the materials at issue." In addition to the oral presentations at the April 30, 2003 hearing, more than two thousand pages of written objections were submitted either prior to or at the hearing. The written comments included an eight-page submission by the Blue plaintiffs (Betty Blue owns Bernard Luggage Company on Vine Street), who objected to the inclusion of the power of eminent domain in the amendment to the redevelopment plan. The massive amount of public comment indicates there was adequate time for the public to review the report to the City Council and to provide meaningful input.

For all these reasons, we reject plaintiffs' contention they or the public were denied sufficient time to review the report to the City Council.

3. *No merit to plaintiffs' contention the respondents were required to form a Project Area Committee; a PAC was not required because the first amendment did not grant the CRA the authority to acquire by eminent domain property on which persons lawfully reside.*

Plaintiffs contend the amendment of the redevelopment plan to provide for the acquisition of property by eminent domain required respondents to form a PAC, which would consult with the CRA on policy matters affecting the residents of the project area.

In this regard, the trial court ruled that "[s]ince the eminent domain power was clearly not to be used to acquire property in which persons were *legally* residing, . . . the law did not require the formation of a PAC. The record further indicates however that the community was significantly involved in this effort, and numerous organizations were consulted and provided comment." (Italics added.)

The pertinent statute, section 33385, provides in relevant part at subdivision (a): "The legislative body of a city or county shall call upon the residents and existing community organizations in a redevelopment project area to form a project area committee in either of the following situations: [¶] (1) A substantial number of low-income persons or moderate-income persons, or both, reside within the project area, and the redevelopment plan as adopted will contain authority for the agency to acquire, by eminent domain, *property on which any persons reside.* [¶] (2) The redevelopment plan as adopted contains one or more public projects that will displace a substantial number of low-income persons or moderate-income persons, or both." (Italics added.)

Respondents, and the trial court, took the position that because the eminent domain power would not be used to acquire property on which any persons *lawfully* reside, there was no requirement to form a PAC in connection with the adoption of the first amendment. Respondents assert that such an interpretation merely confirms the clear intent of the Legislature to protect occupants of property designated for residential use, and that persons who are trespassing or squatting in boarded-up property or otherwise occupying property that was never intended for residential use are not entitled to representation by a PAC.

Plaintiffs disagree, emphasizing the language of the statute is property on which "*any* persons reside" (§ 33385, subd. (a)(1), italics added), *not* property on which persons "*lawfully* reside," and that respondents in effect are rewriting the language of the statute.

There is no case law on point. However, the legislative history states: "Assembly Bill 984 requires local officials to call for the formation of a PAC if they plan to use eminent domain in *residential or mixed-use property* or if the project will displace a substantial number of low- and moderate-income people." (Off. of Sen. Floor Analyses, Analysis of Assem. Bill No. 984 (1993–1994 Reg. Sess.) Aug. 30, 1993, italics added.) Implicit in the requirement that a PAC be formed when eminent domain will be used to acquire "residential or mixed-use property" is that the real property is so designated, so that persons are *lawfully* residing therein.

Additional support for this interpretation is found in a May 20, 2003 opinion by the city attorney relating to these issues, and we quote from its well-reasoned analysis as follows: "Taking both the explicit language of sections 33385 and 33385.3, which requires a person to actually reside on the property, the committee report summaries of [Assembly Bill No.] 984, and due to the express language of the amended Plan, we believe that the power of eminent domain cannot be utilized over property (1) where person actually resides *and* (2) which can legally be occupied for residential use. [¶] For example, the

Agency would not be permitted to exercise its power of eminent domain where a person or persons reside, where the property's lawful use is residential. The lawful use of the property includes building and safety as well as zoning considerations. [¶] Residential buildings in which persons reside, but where the occupancy limits have been exceeded, would not be subject to eminent domain, so long as the units can be legally occupied for residential use and persons actually reside on the property. As a result, it meets the requirement that persons can legally reside in the property, and that persons actually reside there. [¶] On the other hand, a commercial building in a commercial zone, where residential occupancies are not permitted, would be subject to condemnation notwithstanding that a squatter occupies a portion of the property or if a person lives improperly or illegally in, for example, an office or other space where residential occupancy is not lawfully permitted. Although a person occupies a portion of the property, residential occupancy is not lawfully permitted, for example, by zoning and/or other legal restrictions. [¶] The same may be true for a residential building in a residential zone that has been 'red tagged' and declared not habitable by the Department of Building & Safety and where a person has broken into the building and is squatting. Although the building is residential, it has been declared unfit for occupancy, and during that period of time, no person may legally occupy the building for residential use. Any person occupying the building would not be in lawful residence, and therefore the building may be subject to condemnation if the owner is unwilling to bring the building back to habitable standards within a reasonable period of time." (Fn. omitted.)

We agree with respondents, the trial court and the city attorney, all of whom concluded that formation of a PAC is not required where the eminent domain power will not be used to acquire property in which persons *lawfully* reside. Here, the first amendment provides "the [CRA] shall not exercise the power of eminent domain to acquire any parcel of real property in the Project Area on which any persons lawfully reside." Therefore, adoption of the first amendment did not require the formation of a PAC.

III. *SUBSTANTIVE ISSUES.*

1. *Substantial evidence supports the City Council's finding in adopting the first amendment to the redevelopment plan that the project area remains blighted.*

   a. *The City Council duly made new findings that the project area remains blighted; adoption of plan amendment required new findings to be made.*

In adopting the first amendment, the City Council made findings that the project area remains blighted, and that the condemnation of real property as

provided for in the first amendment was necessary to the execution of the redevelopment plan. Although respondents did make a finding of ongoing blight, respondents contend said finding was legally unnecessary because the City Council's earlier finding the project area was blighted had withstood challenge in *Morgan, supra,* 231 Cal.App.3d at pages 254–258, and said finding was final and conclusive. Therefore, according to respondents, the project area is conclusively presumed to be blighted pursuant to section 33368 and new blight findings were not warranted in connection with the adoption of the first amendment. Plaintiffs, in turn, contend that new findings of blight were required but the findings are not supported by substantial evidence.[14]

With respect to whether new findings of blight were necessary, plaintiffs have the better argument.

Section 33368, upon which respondents rely, provides: *"The decision of the legislative body shall be final and conclusive, and it shall thereafter be conclusively presumed that the project area is a blighted area* as defined by Section 33031 and that all prior proceedings have been duly and regularly taken. [¶] This section shall not apply in any action questioning the validity of any redevelopment plan, or the adoption or approval of a redevelopment plan, or any of the findings or determinations of the agency or the legislative body in connection with a redevelopment plan brought pursuant to Section 33501 within the time limits prescribed by Section 33500." (Italics added.)

However, as explained in *Boelts v. City of Lake Forest* (2005) 127 Cal.App.4th 116 [25 Cal.Rptr.3d 164], section 33368 must be read in the whole context of the CRL, instead of in isolation. (*Boelts,* at pp. 126–127.) "In context, section 33368 is part of the general procedures for the adoption of an *initial* redevelopment plan by a local legislative body." (*Id.* at p. 127, italics added.) However, "[a] redevelopment plan can last as long as 40 years. [Citation.] Obviously many things can happen in 40 years that might necessitate some change in a plan. . . . [¶] *And that raises the need for amendments. Amendments have their own article, article 12, in the Community Redevelopment Law, of which section 33368 is not a part.* In many respects the process of amending a redevelopment plan in article 12 parallels the process of adopting an original one as specified in article 5 (procedures for adopting a redevelopment plan). Thus section 33450 not only confers basic authority to amend redevelopment plans, but explicitly makes them subject to referenda. (See § 33450 ['Except as otherwise provided in Section 33378, the ordinance shall be subject to referendum as prescribed by law for the ordinances of the legislative body.'].) And, as with original plans, the statutes governing amendments are 'replete with preliminary requirements for notice and public

---

[14] We address the threshold question whether this finding of blight was warranted because its resolution affects the Blue plaintiffs' liability for costs.

hearings' (see §§ 33451, 33452, 33454; see also §§ 33455, 33458) plus specific notice to local planning commissions (§§ 33453, 33455). [¶] Following these notice and hearing statutes comes section 33457.1." (*Id.* at pp. 127–128, italics added.)

Section 33457.1 provides in relevant part: "To the extent warranted by a proposed amendment to a redevelopment plan, (1) *the ordinance adopting an amendment to a redevelopment plan shall contain the [blight] findings required by Section 33367 . . . ."* (Italics added.)

█ Reconciling sections 33368 and 33457.1, *Boelts* explained: "original blight findings remain conclusive under section 33368 *until* a timely validation action brought pursuant to an amendment (if such findings are warranted under section 33457.1), but, by the very terms of section 33368, *only* until then." (*Boelts v. City of Lake Forest, supra,* 127 Cal.App.4th at p. 131.)

Guided by *Boelts,* we conclude the original blight findings were no longer conclusive and that given the amendment to the redevelopment plan, new findings were warranted. We now address plaintiffs' challenge to the sufficiency of the evidence to support those findings.

> b. *Substantial evidence supports the City Council's determination the project area remains blighted; plaintiffs' challenge to the sufficiency of the evidence is without merit.*

> (1) *The statutory definition of blight.*

█ A determination of blight is a prerequisite to invoking redevelopment. (§ 33030; *Diamond Bar, supra,* 80 Cal.App.4th at p. 395.)

Section 33031 defines the physical and economic conditions that constitute blight. It states: "(a) *This subdivision describes physical conditions that cause blight:* [¶] (1) Buildings in which it is unsafe or unhealthy for persons to live or work. These conditions can be caused by serious building code violations, dilapidation and deterioration, defective design or physical construction, faulty or inadequate utilities, or other similar factors. [¶] (2) Factors that prevent or substantially hinder the economically viable use or capacity of buildings or lots. This condition can be caused by a substandard design, inadequate size given present standards and market conditions, lack of parking, or other similar factors. [¶] (3) Adjacent or nearby uses that are incompatible with each other and which prevent the economic development of those parcels or other portions of the project area. [¶] (4) The existence of subdivided lots of irregular form and shape and inadequate size for proper usefulness and

development that are in multiple ownership. [¶] (b) *This subdivision describes economic conditions that cause blight*: [¶] (1) Depreciated or stagnant property values or impaired investments, including, but not necessarily limited to, those properties containing hazardous wastes that require the use of agency authority as specified in Article 12.5 (commencing with Section 33459). [¶] (2) Abnormally high business vacancies, abnormally low lease rates, high turnover rates, abandoned buildings, or excessive vacant lots within an area developed for urban use and served by utilities. [¶] (3) A lack of necessary commercial facilities that are normally found in neighborhoods, including grocery stores, drug stores, and banks and other lending institutions. [¶] (4) Residential overcrowding or an excess of bars, liquor stores, or other businesses that cater exclusively to adults, that has led to problems of public safety and welfare. [¶] (5) A high crime rate that constitutes a serious threat to the public safety and welfare." (Italics added.)

Section 33030 provides: "(b) A blighted area is one that *contains both of the following*: [¶] (1) An area that is *predominantly urbanized . . . and is an area in which the combination of conditions set forth in Section 33031 is so prevalent and so substantial* that it causes a reduction of, or lack of, proper utilization of the area to such an extent that it constitutes a serious physical and economic burden on the community which cannot reasonably be expected to be reversed or alleviated by private enterprise or governmental action, or both, without redevelopment. [¶] (2) An area that is characterized by either of the following: [¶] (A) *One or more* conditions set forth in any paragraph of subdivision (a) of Section 33031 [physical blight] and *one or more* conditions set forth in any paragraph of subdivision (b) of Section 33031 [economic blight]. [¶] (B) The condition described in paragraph (4) of subdivision (a) of Section 33031. [¶] (c) A blighted area also may be one that contains the conditions described in subdivision (b) and is, in addition, characterized by the existence of inadequate public improvements, parking facilities, or utilities." (Italics added.)

> (2) *No merit to plaintiffs' challenge to the finding of physical blight.*

Plaintiffs' challenge to the sufficiency of the evidence to support the finding of physical blight does not detain us.

■ As set forth above, the presence of a single physical blighting condition, in conjunction with other factors, is sufficient. (§§ 33030, subd. (b)(2)(A), 33031, subd. (a).)

With respect to the existence of physical blight based on the presence of buildings in which it is unsafe or unhealthy for persons to live or work

(§ 33031, subd. (a)(1)), the record reflects 50 percent of the buildings in the project area are deemed to be in need of at least moderate rehabilitation, and 13 percent require either extensive rehabilitation or are dilapidated. The report included maps showing the condition of each building and parcel in the project area.[15]

■ Plaintiffs do not dispute the report's characterization of any particular building in the project area. Instead, drawing on the language of section 33031, subdivision (a)(1), plaintiffs argue there is no evidence there are buildings in the project area in which it is *unsafe or unhealthy* for persons to live or work. The argument is unpersuasive. In describing physical conditions that cause blight, section 33031 provides at subdivision (a)(1): "Buildings in which it is unsafe or unhealthy for persons to live or work. *These conditions can be caused by* serious building code violations, *dilapidation and deterioration,* defective design or physical construction, faulty or inadequate utilities, or other similar factors." Based on the assessment that 50 percent of the buildings in the project area are in need of at least moderate rehabilitation, and 13 percent require extensive rehabilitation or are dilapidated, the City Council reasonably could conclude that physical blight exists due to the presence of numerous deteriorated or dilapidated structures which pose a threat to the health or safety of persons who live or work in them.

It is unnecessary to address the remaining conditions which cause physical blight.[16]

---

[15] Plaintiffs' reliance on this court's decision in *Diamond Bar* is misplaced. In *Diamond Bar*, we found no evidentiary support for the finding of physical blight under any theory. (*Diamond Bar, supra,* 80 Cal.App.4th at p. 398.) However, *Diamond Bar* presented a very different factual picture. For example, "Not a single structure was identified by the city as being 'unsafe or unhealthy for persons to live or work.' (§ 33031, subd. (a)(1).) In assessing the physical conditions in the project area, [the redevelopment consulting firm's] criteria included chipped paint, minor nonstructural defects, and broken windows. Out of 250 buildings in the project area, *only one structure was identified as being in need of 'extensive rehabilitation.'* " (*Diamond Bar, supra,* 80 Cal.App.4th at p. 398, italics added, fn. omitted.)

[16] Plaintiffs contend there is no "true blight" in the Hollywood project area. The argument does not meet the issue because so-called "true blight" is not the operative standard.

As stated in *County of Riverside v. City of Murrieta, supra,* 65 Cal.App.4th at pages 627–628: "True blight is expressed by the kind of dire inner-city slum conditions described in the *Bunker Hill* case: unacceptable living conditions of 82 percent; unacceptable building conditions of 76 percent; crime rate of double the city's average; arrest rate of eight times the city's average; fire rate of nine times the city's average; and the cost of city services more than seven times the cost of tax revenues. (*In re Redevelopment Plan for Bunker Hill* [(1964)] 61 Cal.2d [21,] 45 [37 Cal.Rptr. 74, 389 P.2d 538].) [¶] Another case in which blight was exemplified is *Morgan v. Community Redevelopment Agency*[*, supra,*] 231 Cal.App.3d [at p.] 243 [284 Cal.Rptr. 745]. Blighted conditions in *Morgan* included: unacceptable building conditions of 63 percent, including 25 percent seismically unsafe commercial buildings;

(3) *No merit to plaintiffs' challenge to the finding of economic blight*

Relevant economic blighting conditions in the Hollywood project area include depreciated or stagnant property values or impaired investments (§ 33031, subd. (b)(1)); high vacancy rates and low lease rates (§ 33031, subd. (b)(2)); and residential overcrowding (§ 33031, subd. (b)(4)). The presence of a single economic blighting condition, in conjunction with other factors, is sufficient. (§§ 33030, subd. (b)(2)(A), 33031, subd. (b).)

The administrative record reflects there has been little building activity in the project area other than in connection with CRA-sponsored projects. Between 1987 and 2001, the CRA assisted in roughly two-thirds of the permit activity, as measured by permit value. The sale prices of properties in the project area lag behind the prices for similar properties in similar areas outside the project area. For example, storefront and stand-alone retail buildings sold for 45 percent less and mixed-use buildings sold for 59 percent less than competing small retail buildings in Los Angeles. Further, office space in the project area leases for rates below office space in adjacent and competing sub-markets. The overall office vacancy rate is 27 percent, higher than any of the other competing areas. These circumstances provide substantial evidentiary support for the finding of economic blight.

In sum, the administrative record contains substantial evidence to support the finding that the project area continues to suffer from physical and economic blight.

2. *Substantial evidence supports the finding that blight cannot reasonably be eliminated without CRA intervention.*

In adopting the first amendment, the City Council made a finding that "[t]he elimination of blight and the redevelopment of the Project Area could not reasonably be expected to be accomplished by private enterprise acting alone without the aid assistance of the Agency." This finding in section 4.j. of ordinance No. 175236 tracks the language of section 33367, subdivision (d)(11).

---

overcrowded housing; incompatible adjacent adult-entertainment and industrial uses; no recreational uses; transient rentals; high crime rate; large homeless and runaway population; depreciating property values; and no likelihood of private development and investment."

Plaintiffs' "true blight" argument fails because, as noted in *Diamond Bar,* the statutory definition of blight has evolved over the years (*Diamond Bar, supra,* 80 Cal.App.4th at p. 407, fn. 11), and in any event, case law has found that conditions in Hollywood presented a classic example of blight. (*Morgan, supra,* 231 Cal.App.3d at p. 243; *County of Riverside v. City of Murrieta, supra,* 65 Cal.App.4th at p. 628.)

Plaintiffs contend this finding was warranted or required but the finding is not supported by the administrative record.

It is unnecessary to address the threshold question of whether this finding was required to be made. (Cf. fn. 14, *ante.*) As for the second part of this contention, we conclude the finding is supported by substantial evidence in the administrative record.

The evidence relating to economic blighting conditions, discussed above, provides ample support for the finding that private enterprise acting alone cannot reasonably be expected to eliminate blight and redevelop the project area. As indicated, there have been relatively few building permits issued for projects in which the CRA is not involved. Office vacancies are high and lease rates are low. Properties in the project area sell for less than similar properties elsewhere. These circumstances support the conclusion the project area is still not sufficiently desirable or compelling to private enterprise and that continued efforts by the CRA are needed to eliminate blight in the project area.

> 3. *No merit to plaintiffs' contention the report to the City Council is defective because it fails to set forth an allowance for the cost of acquiring real property by eminent domain.*

The City Council, in adopting the first amendment, found the amended plan was "economically sound and feasible." Plaintiffs fault the report to the City Council for not specifying any specific source for the revenue necessary to cover the cost of acquiring real property by eminent domain, and thus respondents failed to provide the information necessary to determine financial feasibility. The trial court found this argument "without merit because the First Amendment made no changes to the economics of the original redevelopment plan."[17]

Plaintiffs' challenge to the sufficiency of the evidence to support the City Council's finding of economic feasibility is without merit. The report to the City Council indicated the first amendment would not affect the CRA's authority to continue to finance the project area with financial assistance from the city, state, federal government, tax increment funds and other sources. Further, "as contemplated by the Agency, *eminent domain authority will not be utilized extensively in the Project Area. . . .* Therefore, the proposed First Amendment is expected to have no effect on the method of financing redevelopment of the Project Area or the *continued economic feasibility* of the Project Area." (Italics added.)

---

[17] Here again, it is unnecessary to address whether the finding was warranted.

Further, as respondents point out, projecting eminent domain acquisition costs when the first amendment was adopted would have rested on speculation. Eminent domain is just an alternative method utilized by the CRA to implement the redevelopment plan. Prior to exercising the power of eminent domain, the CRA must have the property appraised and attempt to acquire it by negotiation. (Gov. Code, §§ 7267–7267.2.) If property is acquired through negotiation, eminent domain is unnecessary. Therefore, the CRA could not project with any degree of accuracy the cost of property to be acquired by eminent domain.

The real issue is whether substantial evidence supports the City Council's determination the first amendment would not affect the continued economic feasibility of the redevelopment plan. Because the report to the City Council indicated it was not contemplated the eminent domain power would be used extensively, and that the first amendment was not expected to result in significant new unexpected development in the project area, the City Council properly found the amended plan was "economically sound and feasible."

### 4. *No merit to plaintiffs' contention the first amendment and related ordinances violate the purposes of the CRL.*

Plaintiffs contend the purpose of the first amendment and related ordinances is no longer to correct blight conditions in the project area but "to restore Hollywood to its prior glitter and glamour." Plaintiffs focus on two projects in particular: Hollywest, a mixed-use development at the corner of Hollywood Boulevard and Western Avenue, which they describe as a "boondoggle," and the Hollywood Entertainment Museum.

As the trial court found, even if this argument is legally cognizable, it is unavailing. The stated objectives of the Hollywood Redevelopment Plan were never as limited as plaintiffs claim. The plan, adopted in 1986, set forth numerous goals in a broad strategy for eliminating blight. The plan's objectives include promoting the development of Hollywood Boulevard as a unique place which reflects Hollywood's position as the entertainment center; establishing facilities for tourists, as well as active retail and entertainment uses at street level; providing for residential uses; creating a pedestrian-oriented environment; providing a focus for the arts, particularly the performing arts; and recognizing and reinforcing Hollywood's history and architecture.

Plaintiffs' focus on two troubled projects does not support plaintiffs' contention that the first amendment should be invalidated on the ground it is incongruent with the CRL.

## CONCLUSION AS TO MAIN APPEAL

We conclude there was no procedural defect in the adoption of the first amendment and that the administrative record supports the determination of continued blight and other findings which were made.

## THE APPEAL FROM THE ORDER DENYING THE MOTION TO STRIKE OR TAX COSTS.

### PROCEDURAL BACKGROUND

On December 22, 2004, subsequent to entry of the validation judgment, respondents filed a memorandum of costs, seeking a total of $8,438.17, of which $8,350.84 represented the cost of preparing and copying the administrative record. With respect to the total cost of preparing the administrative record, respondents apportioned $4,175.42 to the Blues and Walsh, and $4,175.42 to Morgan.

On January 7, 2005, plaintiffs filed a motion to strike the memorandum of costs or to tax costs. Plaintiffs sought to strike their names from those who were responsible for costs. In the alternative, the motion sought an equitable apportionment as to Walsh so that he would be assessed one-third of the total payment assessed to the Blues and Walsh, reducing Walsh's obligation to $1,391.81.

On March 16, 2005, after considering the moving and opposing papers and hearing oral argument, the trial court denied the motion to strike or tax costs.

Blue and Walsh filed a timely notice of appeal from the order.[18]

### CONTENTIONS

Plaintiffs contend each of them brought the validation action in order to protect a real property right and to prevent their property rights from being subject to eminent domain, so that they are entitled to be free from the costs of litigating their claims. As for Walsh, his possession of an apartment unit is tantamount to an ownership interest, and therefore he too is exempt from liability for costs. In the alternative, an equitable apportionment should be made, limiting Walsh's liability to one-third of the total costs assessed to plaintiffs, or $1,393.81.

---

[18] The order denying the motion to strike or tax costs is separately appealable as an order after final judgment. (Code Civ. Proc., § 904.1, subd. (a)(2); 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 141, pp. 207–208.)

## DISCUSSION

1. *Respondents concede the Blues, as property owners, are not liable for costs herein.*

Respondents concede that if this court determines new findings of blight were required in connection with the amendment to the redevelopment plan, the Blue plaintiffs, as property owners in the project area who filed suit in an attempt to prevent acquisition of their property by eminent domain, are exempt from liability for costs.

As discussed above, guided by *Boelts v. City of Lake Forest, supra*, 127 Cal.App.4th at page 131, we concluded the original blight findings were no longer conclusive and that the first amendment to the redevelopment plan required new findings to be made.

Because the new findings of blight were required, and in view of respondents' concession, we hold the Blues, as property owners, are not liable for costs.

2. *Walsh is not a property owner in the project area and therefore remains liable for costs.*

a. *The Bunker Hill decision.*

■ *Bunker Hill* sets forth the following rationale for relieving property owners from liability for costs in eminent domain litigation: "It is settled that clearance of blighted areas and redevelopment thereof are public uses. [Citation.] Public use is, however, one of the issues which owners reluctant to give up their property may justifiably raise in eminent domain proceedings as well as in actions in inverse condemnation or 'in the nature of eminent domain.' *Even though they may not prevail on this issue in either trial court or on appeal, it appears from the most recent expressions of the court that they are entitled to be free from costs in litigating it.* [Citations.] In defending against the subject agency proceeding objectors challenged the council's finding of blight, upon which the factor of public use turns. Inasmuch as the agency has prevailed in this proceeding, then, if and when it seeks to condemn objectors' property, the matter of public use will have been removed from the issues. Under such circumstances we are persuaded that as to this aspect of the case the proceedings should logically be considered in the nature of eminent domain, with no costs to be assessed against the property owners." (*In re Redevelopment Plan for Bunker Hill, supra*, 61 Cal.2d at p. 71, italics added.)

b. *Walsh cannot bring himself within the rule relieving property owners from liability for costs in eminent domain proceedings.*

Walsh's theory is that as the occupant of an apartment within the project area, which apartment is subject to the Los Angeles Rent Stabilization Ordinance, he is vested with rights which are tantamount to a right of ownership and thus an ownership interest. Walsh contends that in this action he sought to protect his city-created interest from acquisition by the CRA under the power of eminent domain, and that given this property interest, he too is exempt from liability for costs.

The argument is unavailing. Walsh cites no authority for the proposition his possession of a rent-controlled apartment in the project area exempts him from liability for costs.

Further, and in any event, the *Bunker Hill* rationale has no application to Walsh's circumstances. The first amendment to the redevelopment plan expressly provides: "The Agency shall not exercise the power of eminent domain to acquire any parcel of real property in the Project Area on which any persons lawfully reside." Therefore, Walsh's residential tenancy was in no way threatened by the first amendment. Accordingly, assuming arguendo Walsh has a property interest in his apartment tenancy, because such interest was not jeopardized by the first amendment, the *Bunker Hill* rule is unavailing to him.

3. *No showing the trial court erred in denying Walsh's request for equitable apportionment.*

Lastly, Walsh contends that at a minimum, he should be held liable for only one-third of the total costs assessed to plaintiffs, or $1,393.81. The argument lacks merit. The trial court denied Walsh's request for equitable apportionment and we perceive no error in that ruling.

As respondents point out, the cost incurred by them for the copy of the administrative record provided to plaintiffs' counsel was not dependent upon how many plaintiffs there were. The cost would be the same whether there was one plaintiff, or three, or 30, so long as they were jointly represented. Therefore, the trial court did not abuse its discretion in refusing Walsh's request for apportionment.

## DISPOSITION

The validation judgment is affirmed. As for the order denying the motion to strike or tax costs, insofar as the order denies relief to the Blues, the order is reversed with directions to strike the Blues' names from those who are required to pay costs; the order is affirmed insofar as it denies relief to Walsh.

No costs are awarded on appeal.

Croskey, J., and Kitching, J., concurred.

A petition for a rehearing was denied March 24, 2006, and appellants' petition for review by the Supreme Court was denied June 14, 2006, S142906.